ELISHA B. STEERE *et al.*

*v.*

BIGELOW HOAGLAND *et al.*

1. CREDITORS' BILLS—*in what cases may be filed, when execution has not issued.* As a general rule, there must be a judgment, and an execution returned unsatisfied, before a creditor's bill will be entertained; but there are exceptions to this rule. In proceedings against insolvent estates, an execution is not essential to give the court jurisdiction, and under our statute an execution cannot issue against an administrator so as to reach personal assets. In such cases, a resort to equity may be had without suing out execution.

2. CHANCERY—*may be resorted to in the first instance, when the fund cannot be reached at law.* When a fund cannot be reached at law, and is only accessible to a court of chancery, and the debtor is dead, creditors may resort to equity in the first instance; and especially so when the estate is insolvent.

3. CREDITOR'S BILL—*will not lie in State court, on a judgment obtained in the federal court.* A judgment obtained in the United States court, being the adjudication of the court of another jurisdiction, our courts will not recognize such proceedings, as the basis upon which to afford relief.

4. SAME—*will lie on justice's judgment.* A justice's judgment is a sufficient foundation for a creditor's bill, if the amount is large enough to confer jurisdiction on the court.

5. SALE. When A claimed to have sold a stock of goods to B, and the proof was, that such purchase was not an absolute one, but that B simply became a partner, and secretly held two-thirds of the stock in trust for A and his partner; *held,* that such sale was fraudulent, and designed to hinder and delay creditors in the collection of their demands.

APPEAL from the Circuit Court of Macon county; the Hon. JOHN M. SCOTT, Judge, presiding.

This was a bill in chancery, in the nature of a creditor's bill, brought by the appellees against the appellants, upon three judgments against one Byron W. Gray. Two of these judgments were rendered in the United States Circuit Court for the Southern District of Illinois, and amounted in the aggregate to the sum of $3,504.86, besides the costs. The other judgment was obtained in the Circuit Court for McLean county and amounted to $1,032.34, and costs. Gray was a merchant doing business at Bloomington, Illinois, and these judgments were

obtained upon notes, which Gray had executed to the appellees, for goods purchased by him from them. The bill charges that in April, 1861, prior to the rendition of these several judgments, Gray fraudulently transferred his entire stock of goods, which at that time invoiced at $48,000, and were worth $50,000, to Elisha B. Steere, one of the appellants, who immediately took possession of the same, and continued the business at the same place with Gray's assistance, and during this time was engaged in buying up Gray's indebtedness at forty cents on the dollar. That there was a secret arrangement between them, that Steere should take the goods and hold them in trust for Gray, and that Steere never in fact purchased them; that such transfer was made without any consideration, and for the purpose of hindering and delaying the creditors of Gray in the collection of their claims. Gray died in July, 1863, intestate and insolvent, except as to the assets in Steere's hands, which it is sought by this bill to reach. In the court below a decree was rendered for the complainant, the court finding the transaction fraudulent, from which the defendants appealed to this court. The further facts in the case are fully stated in the opinion.

Mr. ROBERT E. WILLIAMS and Messrs. HIGGINS & SWETT, for the appellants.

Messrs. WOODSON & HANNA, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

While it may be true, as a general rule, that there must be a judgment and an execution returned no property, before a creditor's bill will be entertained, yet to the rule there are well recognized exceptions. In proceedings against insolvent estates an execution is not regarded as essential to give the court jurisdiction. Under our statute of wills, and judgments and executions, an execution cannot issue against an administrator so as to reach personal assets. And in such cases it is held, that a resort may be had to equity without the necessity of suing out executions. *McDaniel* v. *Cochrane*, 11 Ill. 31; *Bay* v.

*Cook*, 31 Ill. 336. There is, therefore, no force in this objection.

It is also insisted, that the judgments in the Circuit Court of the United States are not such as will authorize a creditor's bill to be exhibited in the State courts. That being the adjudication of a court of another jurisdiction, our courts will not recognize such proceedings as the basis upon which to act, and to afford relief. It has been held that a creditor's bill will not lie, in the courts of one State, to enforce a judgment recovered in another State. And in the case of *Tarbell* v. *Griggs*, 3 Paige, 207, it was held that a recovery of judgment in the United States Circuit Court, with a return of execution unsatisfied, will not sustain a creditor's bill. In the case of *Dix* v. *Briggs*, 9 Paige, 595, it was also held that the return of an execution unsatisfied, from a justice of the peace court, is not a sufficient foundation for a creditor's bill. But in this State the rule is different if the judgment is large enough to confer jurisdiction on the court. *Ballentine* v. *Ball*, 3 Scam. 203.

But where a fund is only accessible to a court of chancery, and cannot be reached at law, and where the debtor is deceased, creditors may resort to chancery in the first instance without having first recovered a judgment at law. *O'Brien* v. *Coulter*, 2 Blackf. 421. And in the case of *Smith* v. *Sheppard*, 2 Hay. 163, it was held that the creditors of a deceased debtor may file a bill against the administrators and heirs for an account, without having first reduced their claims to judgment against the administrator. From these authorities it would appear, that unless there are special circumstances to take a case out of the general rule, there must have been a judgment and execution returned no property found, before the court will entertain a bill. And they seem to as fully establish, as an exception to the rule, that, in case of a deceased debtor, as a judgment and execution against the executor or administrator would be unavailing, the creditor may resort to a court of chancery in the first instance, and, we think, especially so, when it appears that the estate is insolvent, and that the debt could not be paid in the ordinary course of administration. We are, there-

fore, of the opinion that, in this case, where it is admitted that Gray's estate is insolvent, it was immaterial whether a judgment was recovered in any court, before this suit was brought.

We now come to the question whether the sale from Gray to Steere was fraudulent and designed to hinder and delay the creditors of the former. If fraudulent, it, like all such transactions, was designed by the parties to assume all the appearance of a fair and honest sale. But Spencer and his son both swear that it was contrived and executed for fraudulent purposes. That instead of Steere becoming an absolute purchaser of the stock of goods, he only became a partner, and secretly held two-thirds of the stock and property of the former firm on a secret trust for Gray and young Spencer. But it is urged that, being parties to the transaction by their own admissions, their evidence should be received with great caution. It may be true that witnesses occupying such an attitude are entitled to less credit than they would be if differently situated. A careful scrutiny of their evidence shows that it is as consistent as is usually the case. And when considered independent of the other evidence in the case, we feel satisfied that it is sufficient to fix fraud upon Steere and Gray in the transaction. It is, however, insisted that the evidence of other witnesses overcomes the weight of their testimony.

It is, to say the least of the transaction, singular that, in this whole matter, all the parties connected with it, with the exception of the Spencers, were near relations of Gray, no more remote in degree than brothers-in-law. Steere, Loveland and Brown were all brothers-in-law, and they all seem in one way and another to have been active participants in consummating the matter and bringing it to the conclusion at which it finally terminated. Steere became the purchaser at one-half the cost of the goods, with Brown, a collecting agent and a brother-in-law, to advise and to aid when necessary, with Loveland to give his assistance when required.

Another circumstance that seems to cast suspicion upon the transaction is that it does not seem that Gray, on his own

motion or the advice of either of his brothers-in-law, ever tried to sell his large stock of goods, well adapted to the market, and but little shelf room, consisting principally of staple goods, with few unsalable articles, to other persons outside of the family connection. He was informed before he transferred the goods to Steere, that he could take in all of his paper except the debt for which Loveland was security and his indebtedness to complainants, at forty cents on the dollar. And with such an offer we would naturally expect him, with near fifty thousand dollars' worth of goods, notes and money, to have made some effort at least to have relieved himself of all indebtedness, when he ceased to own any property. We would have expected him with such an amount of means in his hands to have made efforts to dispose of them to merchants in Bloomington or in the adjoining counties. But on the contrary we find him selling to a brother-in-law, at fifty cents on the dollar of the cost of the goods, and, as we understand the evidence, over two thousand dollars in money, and a considerable sum in notes and accounts, at the same rates. This rather manifests an eagerness on the part of Gray to divest himself of all visible property with as little delay as possible.

Nor does Steere attempt to prove that the terms he purchased on were as liberal as might be expected of a brother-in-law aiding and attempting to rescue another from financial ruin. On the contrary, he seems to content himself with the effort to show that he had dealt no harder with Gray than others would have done. Nor does Brown or Loveland, in their testimony, even venture the opinion that Steere had been generous with Gray. They seem to believe that Steere had paid the worth of the goods at the time he purchased. And while Gray is divesting himself of all his property, for some reason, and upon some considerations, which do not appear, conveyed his dwelling-house to the wife of Loveland. While this may have been a fair transaction, it certainly looks singular that he could only find purchasers in New York for both his goods and his house, and in each instance a near relative, and this too, so far as we can see, without ever having offered this property to any other persons.

In addition to all this, how can Steere now claim that he gave all that the property was worth, when he was willing, as it appears from Brown's testimony, to do all that he did, simply to become a partner to hold but one-third interest in the concern, but was informed that such a transaction could be reached by a bill of discovery? He does not seem to have paid out a single dollar of his own money. Out of the sales from these goods he seems to have paid all of the liabilities incurred for Gray, and not only so but, from the evidence, made, in a few months, a large sum of money. Again, after, as Brown testifies, it was understood and agreed that Spencer and Brown should go to New York, and make the compromise with all of the creditors if it could be done, by his indorsing for Gray for his debts at forty cents on the dollar, and to become a partner with Gray and young Spencer, why should he, when they failed to make the compromise, now insist that the transaction was fair when he incurred a less liability? Or why attempt to mislead Mead, as he evidently did, when the latter proposed to Steere to purchase the goods of Gray, and pay the purchase-money on Gray's debts at forty cents on the dollar, by requesting him to telegraph Gray, and ascertain whether he would sell, when he had Gray's offer to sell, and had not informed him that he declined to purchase? Why not have informed Mead that Gray had made him such an offer, and he then had the right to accept it if he chose? It could only have been to make false impressions on Mead, and to furnish evidence in the future.

It is however urged, that he declined having any thing farther to do with the matter after a compromise was made, and that this is evidence of a new and distinct negotiation, and an independent transaction. It may be readily supposed that when he induced Mead to telegraph to Gray, that it was intended to make evidence to support that theory. It may be asked what motive he could have had in giving the matter a new character. It seems that Loveland was not friendly with Spencer, and he seems to have entertained but a low opinion of his moral integrity, and it would not be strange if he should

have desired to exclude young Spencer, who was a minor, and unable to contribute to the capital of the business, and in case of loss would not be liable for the debts, from all participation in the business of the concern, and thus his brothers-in-law would be freed from a division of profits with the son, and from the interference of the father in the business of the firm, for the protection of his son. If such was the motive it is by no means unnatural that Brown and Steere should readily adopt the suggestion. If so, there is nothing more rational than to conclude that Steere, for the time being, would decline to Spencer and others to purchase the goods, and by some means start new negotiations for the purchase. If such was the design, Spencer was too fully informed of their designs to break with him openly, and the fact that young Spencer immediately left the concern after Steere took charge, and Gray continued in the house, seems to favor the supposition. And the fact that Gray still continued in the store, and seemed to have the management and control of the collection of the claims transferred to Steere, seems to support the supposition that Gray still retained an interest in the concern.

The New York merchants seem to regard the transaction as fair, and no doubt so regard it from the facts in their knowledge. But it does not appear that they were apprised of the fact that Gray had gone to the State of New York to confer with Spencer and Steere, or that they knew that Steere had a proposition to sell from Gray at the time Mead telegraphed to learn of Gray whether he would sell. Nor were they apprised that it had been proposed, in the conference with Gray, that Steere should apparently become an absolute purchaser, but only for the purpose of covering up the property of Gray and young Spencer from their creditors.

The New York merchants suppose that the goods were purchased by Steere at a fair price. In this they, no doubt, are sincere, but we suppose that their opinion is based upon what the goods would have been worth to them, and not what they were worth in Bloomington. Merchants, and well informed business men, residing in that place, seem to differ widely from

them, and, when all the circumstances are considered, we must regard the testimony of the latter as more satisfactory. They were in the same business; were at the place; knew the condition of the market, and the different means of disposing of the stock, and their testimony must be more reliable than persons living at so great a distance, and who were, necessarily, uninformed as to the best disposition that could have been made of this stock. It also appears that most of these goods were sold at first cost, some for more, and others less; and that Steere must have realized a large sum of money, over and above all of his liabilities, incurred in the purchase of the goods or otherwise; and all within the space of but a few months.

When all of the testimony is attentively considered, we think it proves that the transaction was contrived to hinder and delay Gray's creditors in the collection of their debts. Even if the testimony of the Spencers was excluded, still we are of the opinion that the remaining portions of the evidence preponderates in favor of complainants. The transfer of the goods having been made to hinder and delay complainants in collecting their debts, the transaction must be treated as a fraud upon their rights, and Steere held liable to account for the proceeds of the goods purchased of Gray. But as there is not satisfactory evidence in the record from which an account can be stated, and it does not appear what sum of money remains in his hands, the decree of the court below must be reversed and the cause remanded, with instructions to refer the case to a master to state an account, in which Steere will be charged with all moneys received from Gray, and from the collection of the notes and accounts transferred to him by Gray, and for all sums received from the sale of the goods. And to be allowed as a credit against such charges, all moneys paid on Gray's debts, and all reasonable charges incurred for collecting the notes and accounts, and all expenses for selling and converting the goods into money, and report the account to the Circuit Court for its further action.

*Decree reversed.*