## EMILY O. DILWORTH, EX'X.

### *v.*

## JOHN F. CURTS *et al.*

*Filed at Springfield November 24, 1891.*

1. FRAUDULENT CONVEYANCE—*liability of grantee.* Where an insolvent debtor fraudulently conveys his real estate and personal property, including his notes and accounts, to another, who is empowered to dispose of the same and to pay such creditors as the grantee may be able to make terms with, the latter will have no cause of complaint if the court, on creditor's bill, charges him with such amounts as he may have received from sales of the property and from collections, and gives him credit for all payments made by him to creditors of his grantor, and charges him with the value of such property as he may have encumbered to pay his own debts or otherwise converted to his own use, so as to put it beyond the reach of executions, at the time he so encumbers or appropriates to his own use.

2. Where the fraudulent grantee of property encumbers the same to secure his own debt to one entitled to protection as a *bona fide* creditor of such fraudulent grantee, the latter will have no right to insist that the creditors of the fraudulent grantor shall first seek satisfaction out of the property so encumbered, when the encumbrance, at the time of the hearing, exceeds its value. The court is not bound to require the creditors to perform a useless act as a condition precedent to obtaining a personal decree against the grantee for the value of the property at the time he encumbered the same.

3. On a creditor's bill the master charged the fraudulent assignee of the debtor with certain notes and accounts which he had received, which were not on hand when the bill was filed and were not accounted for, and also with certain other notes and accounts which went into his hands, which might have been collected by the use of ordinary diligence: *Held,* that there was no error in such charge.

4. Where such holder accepts a large amount of notes and accounts, on a transfer of his assignor, to defraud creditors, the law will hold him to use due diligence to protect and preserve the same; and if they are good and collectible, the duty will rest on him to exercise at least ordinary diligence to collect them, and if he fails to do so, and in consequence thereof a portion of the notes and accounts are lost through his fault, the law will hold him personally responsible.

5. The failure of the fraudulent assignee to render any account in reference to what had become of the notes and accounts coming to his

hands, is sufficient to raise a presumption that he had collected them, and in the absence of any explanation he was properly chargeable with them.

6. The fact that the creditors of a fraudulent grantor fail to have a receiver appointed to take charge of the property fraudulently transferred, will not absolve the grantee from personal liability to the creditors for the property converted by him to his own use, or lost by his negligence.

7. CREDITOR'S BILL—*decree after reversal—creditor not precluded by remedy sought by original bill.* The fact that the creditors of a fraudulent grantor, in and by the original decree on creditor's bill, sought to follow the property fraudulently conveyed, instead of taking a personal decree against the fraudulent grantee, will not preclude them, after the decree has been reversed, from adopting a different course, and taking such a decree as the facts and the evidence in the case on the final hearing may warrant.

8. SAME—*second decree—computing interest on amount of first decree.* On creditor's bill the original decree found the sums due on the several judgments sought to be collected, which was reversed in part by this court. On a second hearing the court computed the interest on the judgments from their dates, and not on the sums found by the first decree : *Held,* that the interest was properly computed on the judgments, as the bill sought their collection, and not the decree.

9. SAME—*judgment reversed in part and affirmed in part—how far conclusive.* Where a decree in a creditor's bill finds the several sums due from the judgment debtor to the several judgment creditors, and such decree is affirmed by this court, on appeal, as to such finding, though reversed as to other matters, the judgment of this court will be conclusive on the parties as to the amounts found to be due on the several judgments, and such decree as affirmed can not afterward be impeached for any error in the proceeding.

10. SAME—*jurisdiction of court—does not depr d on sufficiency of evidence.* A court of equity has jurisdiction of a creditor's bill, by the statute, to compel a discovery of property of a judgment debtor and to subject the same to the payment of his debt; and when such court acquires jurisdiction of the persons of the defendants, by service or appearance, its decree will not be void for want of jurisdiction, because based upon insufficient evidence, or upon a judgment of a Federal court. At most, the entry of a decree on insufficient evidence of indebtedness is but an error, not affecting the jurisdiction of the court.

11. MARSHALING ASSETS—*for the benefit of partners.* The right, in equity, to have the partnership and individual assets marshaled, rests in the hands of the partners, and must be worked out through them

or their representatives. The rule is for the benefit and protection of the partners themselves, and the equity of the creditor is of a depend-ent and subordinate character, and is to be worked out through the medium of the equities of the partners.

12. SAME—*no application under creditor's bill to charge fraudulent grantee.* The equitable doctrine in respect to the marshaling of assets has no application to a proceeding by creditors to charge a fraudulent grantee of property with its value or its proceeds. ʹ If such grantee holds in his hands property or money belonging to his grantor, he can not be heard to object to a decree because it finds him liable to joint as well as individual creditors of the grantor, as he has no interest in the question whether the sum for which he is liable shall be paid to one set of creditors or another.

13. CHANCERY RECORD—*what constitutes—certificate of evidence.* The bill, answer, replication, and all exhibits to the bill and answer in a chancery case, together with all stipulations taken therein, and other papers filed in the cause as a part thereof, become a part of the record without being preserved by certificate of evidence.

14. SAME—*transcript, how made.* The papers in a chancery case, when filed therein, become a part of the record thereof as fully as if copied in the record book of the court, and transcripts of the record are made by copying the files and the orders of the court as entered of record by the clerk.

15. SAME—*stipulation filed.* A stipulation filed in one of several cases in chancery, which provides that the cause in which it is filed may be decided in vacation, and that a similar decree may be rendered in the other cases, with right of appeal, and that if but one of the cases is taken by appeal to the Supreme Court the other cases shall follow the result of it in the latter court, is a part of the record without being preserved in a certificate of the court.

16. PRACTICE IN SUPREME COURT—*error will not always reverse.* On creditor's bill the master found that a fraudulent grantee of an insolvent debtor had received from the property wrongfully placed in his hands over $42,000, but he was required to pay the creditors of his grantee a sum less than $28,000. It was *held,* that if he was erroneously charged with $8000 of the first amount, it was an error that did him no harm.

17. SAME—*waiver of error.* Even if it be error to base a decree on a creditor's bill upon a judgment of a Federal court, the defendant failing to assign the same for error on appeal or writ of error will waive the error, and can not, on a second appeal or writ of error, take advantage of the same.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on writ of error to the Circuit Court of Hancock county; the Hon. T. M. SHAW, Judge, presiding.

Messrs. McCULLOCH & McCULLOCH, and Mr. C. J. DILWORTH, for the plaintiff in error:

The State courts have no jurisdiction of a creditor's bill based on a judgment of the Federal courts. *Steere* v. *Hoagland,* 39 Ill. 264; *Tarbell* v. *Griggs,* 3 Paige, 207; *Patterson* v. *Lynde,* 112 Ill. 196; *Munson* v. *Harroun,* 34 id. 422; *Logan* v. *Lucas,* 59 id. 237; *Winslow* v. *Leland,* 128 id. 304.

The creditors should have been first required to pursue the property of S. S. Phelps before seeking to hold William Phelps personally liable. *Preston* v. *Colby,* 117 Ill. 477; Bump on Fraud. Con. 566-568; *Halbert* v. *Grant,* 4 Mon. 580.

In order to sell the land conveyed to Myron Phelps to secure William Phelps' debt, it became necessary to revive the suits against the legal representatives of Myron Phelps. *Low* v. *Pratt,* 53 Ill. 438.

The rule established by this court in the case before it seems to be, to charge William Phelps with only what he actually received of the assets of the judgment debtor, and to credit him for debts paid by him. The master and court below charge Phelps with all the notes and accounts turned over to him,—not only those he had collected, but those he had not; those on hand at the time of filing the bills, and those not then on hand; those turned over to him and which he could not account for, and those which he failed to collect for want of proper diligence.

The judgments in the Curts case were for the debts of S. S. Phelps & Co., those in the Berthold case were for the individual debts of S. S. Phelps, and that in the Nichols case was for the debt of Phelps & Rice. How can William Phelps be held liable to them jointly for the full value of the assets of the several firms? The individual creditors of S. S. Phelps can

not charge William Phelps with the full value of the assets, for they did not belong wholly to S. S. Phelps. Neither could the creditors of Phelps & Rice charge him any further than could the individual creditors of S. S. Phelps.

An attempt is made to raise the question of *res judicata* by the introduction of an additional record; but the additional matter,—a stipulation,—constitutes no part of the record. *Brockenbrough* v. *Dresser*, 67 Ill. 225; *Van Pelt* v. *Dunford*, 58 id. 145; *Heacock* v. *Hosmer*, 109 id. 245.

Originally, the bills sought to remove fraudulent convey-ances and to reach equitable assets, but now the suit stands to charge William Phelps with the value—not the proceeds—of certain lands and other assets received by him. The last decree rests upon a basis wholly different from the former decree.

Messrs. MANIER & MILLER, Mr. W. C. HOOKER, and Mr. G. EDMUNDS, for the defendants in error:

The circuit court, under section 36, chapter 21, of the Re-vised Statutes, has authority to entertain creditors' bills on judgments after return of no property, and its jurisdiction is not restricted to judgments in the State courts.

But if it was error to include judgments of the United States court, that error was waived by the failure of the defendants to make any objection on that account. The defect, if any, was apparent on the face of the record. After the decree was affirmed as to the amount found due, and reversed, and the cause remanded for other purposes, the defendants were es-topped from raising the question of jurisdiction. *Richards* v. *Railroad Co.* 124 Ill. 519; *Wilkinson* v. *Yale*, 6 McLean, 16; *Johnson* v. *Waters*, 111 U. S. 640; *Bartlett* v. *Taylor*, 34 Miss. 708; *Montague* v. *Selb*, 106 Ill. 59.

William Phelps, after encumbering the lands beyond their value, can not insist upon a sale of the same, subject to the

mortgage, as a condition precedent to his personal liability for his conversion of the property to his own use.

As to the right to charge William Phelps personally for the value of the lands fraudulently conveyed to him by the debtor, which William mortgaged to Myron Phelps to secure his own debts, see Bump on Fraud. Con. chap. 24; Perry on Trusts, sec. 843; *Van Winkle* v. *Smith,* 26 Miss. 494; *Howe* v. *Camp,* Walker's Ch. 527; *Reeg* v. *Burnham,* 55 Mich. 39.

For what notes and accounts William Phelps should be held liable, see Tif. & Bull. on Trustees, 580, 581; *Estate of Corrington,* 124 Ill. 366.

The stipulation filed in the cause has been treated as a part of the record for twelve or fifteen years by all parties, and it is now too late to object to it.

As to waiver of objection to jurisdiction of State court, see *Ellis* v. *Sisson,* 96 Ill. 123; *Hook* v. *Richeson,* 115 id. 446; *Smyth* v. *Neff,* 123 id. 313; *Kimball* v. *Walker,* 30 id. 503; *Ohling* v. *Luitjens,* 32 id. 28; *Stout* v. *Cook,* 41 id. 447; Daniell's Ch. Pl. and Pr. (3d ed.) 5741; *Dodge* v. *Wright,* 48 id. 382.

On a subsequent appeal, errors can not be assigned of any matter or defect that existed prior to the first appeal. *Manufacturing Co.* v. *Wire Fence Co.* 119 Ill. 42; *Hollowbush* v. *McConnel,* 12 id. 203; *Newberry* v. *Blatchford,* 106 id. 592.

The law does not recognize the creditor of a firm as having a superior equity to that of the individual creditor for payment from partnership assets. *Singer* v. *Carpenter,* 125 Ill. 120; *Ladd* v. *Griswold,* 4 Gilm. 37.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a creditor's bill, brought by certain parties, creditors of S. S. Phelps, S. S. Phelps & Co., and Phelps & Rice, against Stephen S. Phelps, William Phelps, Myron Phelps and others, to reach certain property which had been conveyed by

S. S. Phelps & Co. in fraud of creditors.   The proceeding was
instituted in Henderson county on September 24, 1862, by
filing three bills.   The first bill, which is known as the "Curts
bill," was predicated upon six judgments rendered in the
circuit court of Henderson county, against Stephen S. Phelps
and Arthur S. Phelps, partners, composing the firm of S. S.
Phelps & Co.   The second bill, which is known as the "Ber-
thold bill," was predicated upon one judgment in the Circuit
Court of the United States and three in the circuit court of
Henderson county, against Stephen S. Phelps alone.   The
third bill, called the "Edwards bill," was predicated upon one
judgment in the United States Circuit Court, against Stephen
S. Phelps and George P. Rice, partners, composing the firm
of Phelps & Rice.

It appears from the pleadings and the undisputed facts in
the record, that for a number of years prior to August, 1861,
S. S. Phelps & Co. had been engaged in the mercantile and
banking business in Oquawka; that S. S. Phelps, who was
the principal member of the firms of S. S. Phelps & Co. and
Phelps & Rice, had become indebted to the amount of $114,-
000; that, being pressed for payment, he conveyed to his
brother, William Phelps, a large quantity of real estate, and
also transferred to him a large quantity of notes, accounts and
personal property.   The three bills were filed for the purpose of
impeaching the transfer of the property as fraudulent against
creditors.   Answers were put in to the bills, and after much
delay, at the August term, 1873, of the Henderson circuit
court, a decree was rendered in favor of the complainants, to
reverse which Stephen S. Phelps, William and Myron Phelps
appealed, and the decree of the circuit court was reversed in
part and affirmed in part.   (See *Phelps* v. *Curts*, 80 Ill. 111.)
The complainants filed a remanding order in the circuit court
of Henderson county, and the three causes were re-docketed
in that court, but subsequently the venue was changed to Han-
cock county, and the three cases were, by agreement, consol-

idated.  A reference was made to the master, when a large quantity of evidence was taken, and a report filed, in which the master, among other things, found that there was due the complainants on October 5, 1885, on their several judgments, $27,576.85; that William Phelps received of the assets of S. S. Phelps & Co., with which he is chargeable, a certain specified sum of money; that William Phelps paid and discharged certain debts of S. S. Phelps & Co. before the filing of the bill, with which he should be credited; that deducting the amount with which William Phelps is entitled to credit from the total amount with which he is properly chargeable, leaves $44,114.26, for which he ought to account.  The master also found that certain real estate which had been conveyed by S. S. Phelps to William Phelps still remained in his hands undisposed of.

Exceptions were filed to the report of the master, which the court overruled, and on the hearing on the pleadings and evidence rendered a decree finding that there was due the complainants the sum of $27,887.85.  The court also decreed as follows: "It is therefore ordered, adjudged and decreed, that unless the said William Phelps shall, within twenty days, pay to the complainants, respectively, the amounts found due them as aforesaid, and the costs of suit, the said real estate mentioned in the master's report be sold by the special master for the satisfaction of the decree, and, after paying costs, to distribute the balance *pro rata* among the complainants, and that if the same shall not sell for enough to satisfy said decree, said special master shall report the same to the clerk of the court, showing the amount realized from the sale and the application of the proceeds; that said William Phelps, within ten days after said sale, pay to the complainants the balance of the debts so found due them, respectively, with interest and costs, the court finding him liable to each and all of said complainants for any sum due them and each of them, after the sale of the lands aforesaid, and in default of such payment

that an execution issue in the consolidated cause as on a judgment at law, the proceeds of such execution to be pro-rated among the complainants."

It will be observed that one of the judgments in the Berthold bill and all of the judgments in the Edwards bill were rendered in the Circuit Court of the United States for the Northern District of Illinois, and it is insisted that the circuit court had no jurisdiction to entertain a bill predicated upon a judgment rendered in the Federal court. Section 49, chapter 22, of the Revised Statutes of 1874, provides: "Whenever an execution shall have been issued against the property of a defendant, on a judgment at law or in equity, and shall have been returned unsatisfied in whole or in part, the party suing out such execution may file a bill in chancery against such defendant, and any other person, to compel the discovery of any property," etc. In *Steere* v. *Hoagland*, 39 Ill. 264, and *Winslow* v. *Leland*, 128 id. 338, and perhaps other cases, it has been held that proof of a judgment rendered in the Federal court, that being a court of another jurisdiction, is not sufficient evidence of a judgment at law or in equity as will sustain a creditor's bill which was brought in a State court. Conceding the rule to be as held in the cases cited, the position of counsel that the court had no jurisdiction is entirely too broad. The court had jurisdiction of the subject matter, and while it may have rendered a decree on insufficient evidence, that was a mere error, in no manner affecting the jurisdiction of the court. In *Bush* v. *Hanson*, 70 Ill. 482, it is said: "Jurisdiction has been thus defined: the power to hear and determine a cause is jurisdiction. It is *coram judice* whenever a case is presented which brings this power into action." (*United States* v. *Anedendo*, 6 Pet. 709.) Here, the court acquired jurisdiction of the persons by service of process and the appearance of the defendants, and as to the subject matter there can be no question as to the jurisdiction of the court. It is expressly conferred by law, and the fact that the court may have rendered a decree

on insufficient evidence had no bearing whatever on the juris-
diction of the court.

But conceding that it might be error, as a general rule, to
base a decree on a creditor's bill on a judgment rendered in
the Federal court, the question then arises whether plaintiff
in error is in a position to avail of that error in the present
aspect of the case. As has been heretofore stated, this cause
was before us, on appeal by Stephen S. Phelps, William Phelps
and Myron Phelps, at the September term of this court, 1875.
It then appeared, as it now appears upon the face of the bills
in the Berthold case and in the Edwards case, that the com-
plainants in those two bills relied upon judgments rendered in
the Federal court. Indeed, the decrees which Stephen S.,
William and Myron Phelps then sought to reverse were predi-
cated upon such judgments. The same error, if error it is,
existed and appeared in the record when the causes were sub-
mitted in this court at our September term, 1875. The then
appellant, William Phelps, now plaintiff in error, had an op-
portunity then to assign the error now complained of, and to
rely upon it to reverse the decrees, but he failed to do so. He
allowed the cases to be decided without then raising the ques-
tion, and as he failed to rely upon the error when he had an
opportunity to do so on the former appeal, he must be re-
garded as having waived his right to do so on a subsequent
appeal or writ of error. The former decision is conclusive on
all errors assigned, or that existed and might have been as-
signed. This principle is well settled by authority. *Ogden* v.
*Larrabee,* 70 Ill. 513; *Smyth* v. *Neff,* 123 id. 315; *Newberry*
v. *Blatchford,* 106 id. 597.

Moreover, there is another complete answer to the right of
counsel to rely upon the alleged error upon this record. In
the three decrees rendered in the three cases which were
brought up for review on the former appeals, the court found
the amount due the complainants in each case, and in two of
the cases the amounts found due were based upon judgments

rendered in the Federal court. Now, upon a reference to the case of *Phelps et al.* v. *Curts et al.* 80 Ill. 109, it will be found, as to the amounts found due the respective complainants as incorporated in the three decrees, the decrees were affirmed, and when the judgment affirming was rendered, that ended the controversy. So far as the decrees were reversed the matters therein involved were open to further litigation, but so far as they were affirmed the judgment was a complete bar to any further litigation.

It has, however, been suggested in the argument, that the transcript of the record sent on change of venue from Henderson to Hancock county fails to show that decrees were rendered in the Berthold and Edwards cases, or that appeals were ever perfected in those cases. Of course, if those two cases were not determined in the circuit court of Henderson county, and were not appealed, and the only case appealed and passed upon was the Curts case, plaintiff in error would not be precluded from raising the question relied upon now, as that question could not be raised in the Curts case as originally presented. But defendants in error filed in the Appellate Court an additional record, which discloses facts not embraced in the original record, and which are proper to be considered, and in disposing of the question it will be necessary to refer to some of the proceedings in the cases prior to the time the causes were in this court in 1876.

It appears from an inspection of the record, that at the April special term of the circuit court of Henderson county, where the causes were then pending, a stipulation was signed by the parties, and filed as a part of the record in the Curts case, on May 8, 1873. This stipulation provided that the cause might be decided by the court in vacation, and that a similar decree might be rendered in the Berthold case and in the Edwards case, with right of appeal to either party. The agreement contained this further provision: "If but one of the above cases, being this case of *Curts et al.* v. *Phelps et al.,*

is taken by the parties to the Supreme Court, that the other cases shall in all things abide the result of the said decision in the Supreme Court." In pursuance of this agreement a hearing was had, and at the August term, 1873, of the Henderson circuit court, decrees were rendered in favor of the complainants in the three cases. These decrees were filed on the 30th day of August, 1873. An appeal was prayed and perfected in each of the cases. The three causes were submitted at the June term of this court, and a judgment was entered in each cause, in which the decree of the circuit court was reversed in part and affirmed in part. But the opinion of the court was filed in the Curts case, in view, no doubt, of the stipulation and the manner in which the cases were treated by counsel of the respective parties at the time the causes were submitted.

But it is said this stipulation is no part of the record. We do not concur in this view. The stipulation, after having been executed, was filed with the bill, answer and replication as one of the papers which constituted the files in the cause. The bill, answer, replication, and all exhibits to the bill and answer, and depositions taken in the cause, and other papers filed in the cause as a part thereof, became a part of the record without being preserved by certificate of evidence. (*Bressler et al.* v. *McCune et al.* 56 Ill. 481; *Stevison* v. *Earnest,* 80 id. 513, which lay down the correct rule on this subject.) It is there said: "Our practice with regard to the making of records of judgments is different from that which obtained at common law. The papers of a case, when filed, under our statute become a part of the record as fully as if copied into the record book of the court. (*Harding* v. *Larkin,* 41 Ill. 423.) And transcripts of the record are made by copying the files and the orders of court as entered of record by the clerk. Here the stipulation was filed as one of the papers in the cause. As such it had its office to perform in like manner as did the bill, answer or one of the exhibits, and as one of the files in

the cause no certificate of evidence was required to make it a part of the record."

It is next insisted that the decree is erroneous because it holds William Phelps personally liable for the value of the property received by him, without first exhausting the property of the judgment debtor. The report of the master, which was affirmed by the court, as we understand it, charged William Phelps with such amounts as he received from property sold, and from collections and sales of personal assets, and gave him credit for all payments made creditors of the original debtors. In so far as he encumbered property to secure his own debts, or otherwise placed it beyond the reach of executions against S. S. Phelps & Co., he is charged with the value of the property at the time he so encumbered or appropriated it to his own use. This was in harmony with the decision rendered when the case was here before, as will appear from the following paragraph of the opinion: "Any debts of S. S. Phelps, or of S. S. Phelps & Co., which William Phelps may have paid previously to the filing of the present bill, should be deducted from whatever proceeds he may have received from the fraudulently conveyed property, and in rendering any personal decree against him on account of said proceeds it should only be for the balance after such deduction." The fact that the complainants in the former decree undertook to follow the property fraudulently conveyed, instead of taking a personal decree against William Phelps, did not preclude them, after the decree had been reversed and the cause remanded, from adopting a different course, and taking such a decree as the evidence and facts before the court on the final hearing might warrant.

Complaint is made in the argument because the lands which William Phelps conveyed to Myron Phelps were not decreed to be sold before William Phelps should be held personally liable. It will be remembered that these lands were conveyed by S. S. to William Phelps, and William conveyed them to

Myron to secure a debt he owed Myron of $25,594. While this transaction, as between S. S. and William Phelps, was held to be fraudulent as against creditors, it was also held that, the debt of Myron being *bona fide*, he was entitled to be protected, and that he had a prior lien on the lands so conveyed, for the satisfaction of his debt against William Phelps. It was not claimed on the trial, nor is it pretended here, that this claim of Myron has ever been paid and discharged, and at the time of the decree it amounted to over $60,000, a sum largely exceeding the value of the lands. Under such circumstances, a decree ordering a sale of these lands subject to the lien of Myron Phelps would have been a useless act,—one which a court can never be required to perform. Had the encumbrances which William Phelps had placed on these lands to secure a debt of his own contracting, been removed, there might be plausible ground for claiming that the property should be sold before resorting to his personal liability; but on the hearing he made no pretense that the debt of Myron Phelps had been paid or the lien removed. Upon what principle of equity could it be held that complainants were required to sell lands encumbered for one-third more than their value, as a condition precedent to obtaining a personal decree? Such a course would have resulted in a useless expense, and would have been of no benefit to any person connected with the litigation. William Phelps voluntarily accepted a deed of S. S. Phelps conveying to him these lands. He then conveyed them to Myron Phelps to secure his own debt, thus placing them beyond the reach of the creditors of S. S. Phelps. He did wrong in accepting the conveyance from a failing debtor, and he did wrong in converting the property to his own use which, in justice, should have gone to the creditors of his grantor, and we are aware of no well settled principle which would shield him from personal liability, when, as held when the case was here before, the conveyance to him was fraudulent. Indeed, the decree making William Phelps personally liable is sanctioned

by the decision on the former appeal, and is fully sustained by authority.    Wait on Fraudulent Conveyances, secs. 177, 178; Bump on Fraudulent Conveyances, (3d ed.) 608, 609; 2 Pomeroy's Eq. Jur. secs. 1058-1080; *Ferguson* v. *Hillman*, 55 Wis. 181; *Martha* v. *Curley*, 90 N. Y. 372; *Van Rensselaer* v. *Morris*, 1 Paige, 13; *Lathrop* v. *Brompton*, 31 Cal. 17.

It is also claimed that the master in chancery erroneously charged William Phelps with certain notes and accounts transferred to him by S. S. Phelps & Co., which had not been collected.    Upon examination of the report it appears that the master charged William Phelps with the amount of certain notes and accounts which he had received, as shown by certain exhibits to the answers, but which were not on hand when the bills were filed, and which were not accounted for, amounting to the sum of $1409.45.    The master also charged William Phelps with certain other notes and accounts, as shown by other exhibits to the answers, amounting to the sum of $5321.10, which were unaccounted for after they went into his hands.    The master also charged William Phelps with certain notes and accounts not collected, which passed into his hands, amounting to $1586.19, which, as the evidence showed, might have been collected by reasonable diligence, making a total of $8316.74.    The transfer of the notes and accounts to William Phelps was fraudulent as against creditors, as determined when the case was before us on the former appeal.    It is not denied that Phelps should be required to account for all money received for property or notes and accounts which passed into his hands, in excess of such amounts as he paid out upon the debts of S. S. Phelps & Co. before the filing of the bills.    If he should account for money received in payment of notes and accounts, why, it may be asked, should he not be required to produce the notes and accounts which passed into his hands, or account for the same in some satisfactory manner.    These notes and accounts that the master charged him with had been received by him, and

a failure to produce them, or render any account whatever in reference to what had become of them, was enough to raise a presumption that he had collected them, and in the absence of any explanation it was proper for the master to charge him with such notes and accounts.

As to those notes and accounts which passed into his hands and could have been collected by the exercise of reasonable diligence, but little need be said. When William Phelps saw proper to accept a transfer of so large an amount of property, he was bound to use due diligence to protect and preserve it, and if notes and accounts were good and collectible, it was a duty resting upon him to exercise at least ordinary diligence to collect them. If he failed to do this, and in consequence a portion of the notes and accounts were lost through his fault, he ought to be held responsible.

But if this $8316.74 was improperly charged to William Phelps in stating the account, it does not appear that he was materially injured by such charge. The court found remaining in his hands, after deducting all moneys he had paid out, $42,479.18, with which he was chargeable. But the amount of complainants' debt which he was decreed to pay amounted only to the sum of $27,887.85. Excluding, therefore, entirely the $8316.74 which it is denied was erroneously charged to William Phelps, he would still have in his hands a much larger sum than he was decreed to pay to complainants. If, therefore, the ruling on this question was erroneous, it was an error that did no harm, and can not be relied upon to reverse the decree.

It is said the complainants in the bill had the right, through a receiver, to take charge of the notes and accounts of S. S. Phelps, and in that manner collect them. Doubtless they had that right. If a receiver had been appointed, and Phelps had turned the notes and accounts and other property over to him, he would have been relieved of all responsibility. But that course was not pursued. Phelps received the notes and ac-

counts and entered upon the task of collecting them, and, as we understand the record, he was not interfered with by the complainants, or any one else, in the collection of those claims. The fact, therefore, that a receiver might have been appointed but no such step was taken, can have no special bearing on the case.

The judgments in the Curts case were rendered upon debts of the firm of S. S. Phelps & Co., those in the Berthold case were for the individual debts of S. S. Phelps, and in the Edwards case for the debts of Phelps & Rice, and it is insisted that William Phelps can not be held liable to them, jointly, for the value of the assets of the several firms. The general rule which controls courts of equity in the settlement and distribution of the assets of insolvent partners seems to be well established. Where there is partnership property and also separate property of a partner, the partnership debts should be paid out of the assets of the firm, and the individual debts should be paid from the proceeds of the property of the individual member. But the right, in equity, to have the partnership and individual assets marshaled is one resting in the hands of the partners, and must be worked out through them. The doctrine on this subject is well stated in *Ladd* v. *Griswold*, 4 Gilm. 37, as follows: "The right, in equity, of the joint creditors to seek payment out of the partnership effects, to the exclusion of the separate creditors of deceased or insolvent partners, results solely from the right of the partners, or their representatives, to have the joint estate thus applied. The rule is for the benefit and protection of the partners themselves. The equity of the creditor is of a dependent and subordinate character, and is to be worked out and enforced through the medium of the equities of the partners."

The equitable doctrine on this subject is plain and well understood; but what application has it to the facts presented by this record? Here no creditor of either firm is making any complaint, and no member of either firm is complaining.

What right, it may be asked, has William Phelps to interpose an objection which rests solely with the partners or their creditors? This is a matter in which he has no concern. He holds in his hands money which belongs to the creditors of S. S. Phelps, Phelps & Co. or Phelps & Rice. Whether it shall be paid to one set of creditors or the other is a matter in which he has no interest. Whatever amount is paid he will receive credit for it, and will never be called upon to pay again. This affords him complete protection, and that is all that he can ask. Whether the money he pays over goes to discharge the debts of Phelps, of Phelps & Co. or Phelps & Rice, is a matter in which he has no interest whatever.

One other question remains to be considered. Defendants in error have assigned a cross-error, claiming that in computing the amount due the complainants, the amount as determined by the decree rendered in August, 1873, should be taken as a basis, and interest computed on the amounts found by the decrees from the date thereof, instead of taking the date and amount of the respective judgments as a basis. We perceive no force in this position. There are many objections to it, but one will suffice. The bills were predicated on the amount of the respective judgments, and upon nothing else, and the court could not depart from the pleadings and allow proofs to establish the amounts due complainants, which would not conform to the allegations of the bills.

*Judgment affirmed.*

Mr. JUSTICE SHOPE took no part in the consideration of this cause, having been consulted while at the bar.