## CENTRAL IMPROVEMENT CO. v. CAMBRIA STEEL CO. et al.

## GUARDIAN TRUST CO. v. CAMBRIA STEEL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. December 2, 1913.)

Nos. 3,489, 3,490.

1. APPEAL AND ERROR (§ 266*)—NECESSITY OF EXCEPTIONS—REPORT OF MASTER—DISCRETION OF COURT.

The general rule that, where exceptions are taken to parts of a master's report, the parts not excepted to will stand as correct, and will not be open to review in an appellate court, is subject to the exception that if the report is clearly erroneous in any particular it is within the discretion of the court to correct the error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1552-1565, 1568–1571; Dec. Dig. § 266.*]

2. EQUITY (§ 427*)—DECREE—CONFORMITY TO PRAYER.

Suits in chancery are tried and reviewed in view of the fact that a court of equity has, and frequently exercises, the power, where justice may thereby be done, to grant to litigants the right remedy although they have sought the wrong one.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1001–1014; Dec. Dig. § 427.*]

3. APPEAL AND ERROR (§ 274*)—APPEALS IN EQUITY—POWERS OF APPELLATE COURT—SCOPE OF REVIEW.

A federal appellate court in an equity suit is not compelled to affirm an unjust decree, nor is the appellant so conclusively estopped that it may not attack such a decree by the fact that it gave a wrong reason for its exceptions to the erroneous conclusion of the master which it assails.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1591, 1592, 1605, 1606, 1607, 1624, 1631–1645; Dec. Dig. § 274.*]

4. APPEAL AND ERROR (§ 266*)—APPEALS IN EQUITY—REPORT OF MASTER—EXCEPTIONS TO CONCLUSIONS.

Where it appears on the face of a master's report that he has drawn an erroneous conclusion from the facts he found, the absence of an exception does not disable an appellate court from correcting the error and entering a just final decree.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1552-1565, 1568–1571; Dec. Dig. § 266.*]

5. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY FOR DEBTS OF OLD COMPANY.

A reorganization of an insolvent corporation, by which both its mortgage bondholders and its stockholders in exchange for their bonds and stock are given an interest in the new company, which purchases the property of the old company at a foreclosure sale made pursuant to such plan of reorganization and by the consent of the old company and its stockholders is fraudulent in law as to unsecured creditors of the old company, whose claims are left unpaid, and renders the new company liable for the claims of such creditors, at least to the extent of the value of the interest in the new company secured by the stockholders of the old company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

6. EQUITY (§ 426*)—JURISDICTION—GRANTING AFFIRMATIVE RELIEF TO DEFENDANT.

That a claim has not been reduced to judgment and an execution returned unsatisfied does not prevent the creditor from asserting the lia-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bility of a fraudulent trustee therefor in a federal court of equity in a suit to which the creditor is made a party defendant and wherein the court has acquired jurisdiction of the subject-matter and the parties, and where the adjudication of such liability is necessary to the disposition of the case.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 999, 1000; Dec. Dig. § 426.*]

**7. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION BY STOCKHOLDERS—RIGHTS OF CREDITORS.**

Where the property of a corporation through a reorganization plan, and a consent decree of foreclosure was acquired by a new company in which the stockholders of the old were given an interest by an exchange of their stock for stock of the new company, thus withdrawing such property from the reach of unsecured creditors of the old company, such a creditor is not limited to his remedy against the exchanging stockholders, but may hold the new company liable as a fraudulent trustee of the property.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**8. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY FOR DEBTS OF OLD COMPANY.**

Where, through a reorganization scheme, the property of a corporation was purchased by a new company under a consent decree of foreclosure, and the stockholders of the old company were given in exchange for their stock, bonds, and stock of the new company of substantial value, leaving the claims of unsecured creditors of the old company unpaid, the new company is estopped to deny that the equitable interest of such creditors in the property was at least equal in value to the amount it paid the stockholders.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**9. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY FOR DEBTS OF OLD COMPANY—REMEDIES OF CREDITOR.**

In such case the remedy of a creditor in equity is not limited to a decree subjecting the property to his claim although he is entitled to such remedy, but he may recover directly against the new company to the extent of the value of such payment to the stockholders, which in equity belonged to its creditors.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**10. RAILROADS (§ 30*)—REORGANIZATION—RIGHTS OF CREDITORS—ESTOPPEL.**

The fact that a creditor of the old company, which was also a stockholder, joined in the reorganization agreement, assisted in its promotion, and exchanged its stock thereunder for the bonds and stock of the new company, did not estop it from enforcing its claim against such company, where the agreement did not contain anything requiring the committee in charge, or the new company as successor in trust to the stockholders of the old, to violate their legal obligation to provide for the debts of the old company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**11. RAILROADS (§ 30*)—REORGANIZATION—RIGHTS OF CREDITORS—LACHES.**

A creditor of a corporation held not barred by laches from prosecuting its claim against a new corporation which acquired the stock and property of the debtor under such circumstances as to render it and the property in its hands liable for the debts of the old company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

12. APPEAL AND ERROR (§ 1175*)—APPEALS IN EQUITY—ENTRY OF FINAL DE-
CREE—VARIANCE FROM PRAYER FOR RELIEF.

An appellate court in an equity suit has power to remand the case to
permit the filing of new or amended pleadings by a party praying for the
specific relief to which such party is shown by the proofs to be entitled;
but, where such new pleadings would serve no useful purpose, it may en-
ter a final decree granting such relief, although different from that prayed
for.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–
4587; Dec. Dig. § 1175.*]

13. ESTOPPEL (§ 52*)—NATURE AND ELEMENTS OF ESTOPPEL—"ESTOPPEL IN
PAIS."

The indispensable elements of an "estoppel in pais" are: (1) Inten-
tional or reckless misrepresentation of a known and material fact incon-
sistent with the subsequent claim of him who makes the misrepresenta-
tion; (2) ignorance of the truth and absence of equal means of knowledge
of it by the party who claims the estoppel; (3) action by the latter in-
duced by the misrepresentation and injury to the latter if the truth is
permitted to be proved.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 121–125, 127;
Dec. Dig. § 52.*

For other definitions, see Words and Phrases, vol. 3, pp. 2497–2508;
vol. 8, p. 7655.]

Appeals from the Circuit Court of the United States for the Western
District of Missouri; John F. Philips, Judge.

Suits in equity by the Cambria Steel Company against the Central
Improvement Company and others, and by the Provident Life & Trust
Company against the Kansas City Suburban Belt Railroad Company
and others. From the decrees, the Central Improvement Company
and the Guardian Trust Company appeal. Reversed.

See, also, 120 C. C. A. 121, 201 Fed. 811.

George H. English, Jr., and D. J. Haff, both of Kansas City, Mo.
(Edward P. Gates and E. C. Meservey, both of Kansas City, Mo., on
the brief), for appellant Guardian Trust Co.

Frank Hagerman, of Kansas City, Mo.; for appellee Cambria Steel
Co.

Samuel Untermyer, of New York City, and Samuel W. Moore, of
Kansas City, Mo., for appellee Kansas City Southern Ry. Co.

Newell H. Clapp, of St. Paul, Minn., and Enoch J. Price and Har-
ry S. Mecartney, both of Chicago, Ill., for appellees Edward A. Shedd,
and others.

Before SANBORN, Circuit Judge, and MARSHALL and WIL-
LIAM H. MUNGER, District Judges.

PER CURIAM. The paramount issue in these cases is: Did the
Southern Company become liable to pay the unsecured debt of the Belt
Company to the Trust Company by participating in the execution of
a scheme whereby it acquired the title to the property of the Belt
Company, deprived its creditor, the Trust Company, of recourse there-
to by execution to collect its claim and yet reserved to itself and other
stockholders of the Belt Company an equity in its property and a ben-
efit therefrom more valuable than the amount of the Trust Company's

claim? After exhaustive arguments and briefs and a review of the master's report on which this case came to this court, the conclusion was reached that this question should be answered in the affirmative. This question had been at issue between the Trust Company and the Southern Company in this suit and in actions at law in the state courts for many years. The prosecution of those actions had been repeatedly enjoined and delayed by orders of the court below, and those orders had been as often reversed by this court. While the pleadings of the parties squarely presented the issue, while this issue had been litigated strenuously in this suit, the Trust Company had not in any of its pleadings made a specific prayer for a decree for the payment of its claim by the Southern Company, nor for the seizure or sale to pay it of the property of the Belt Company which the Southern Company had taken. The question had been suggested by three of the stockholders of the Trust Company whether or not, in view of the long delay, this court could or should direct an entry of a decree for such relief in these cases rather than to leave that relief to be granted upon trials of the cases in the state court, and, as this question had not been argued, counsel for all the parties were permitted to be heard upon it. That hearing developed into a reargument of all the salient issues in the cases, and at the close of that hearing they were taken under advisement by the court. It is the purpose now to state the conclusions at which we have arrived after another consideration of the issues presented.

The history of this litigation, the issues, and many of the facts found by the master are set forth in our former opinion. Central Improvement Co. v. Cambria Steel Co., 201 Fed. 811, 120 C. C. A. 121.

[1] 1. From all the facts pertinent to the issue which are set forth in many printed pages of his report, the master deduced this decisive conclusion:

"That the Southern Company is not liable in any way for the floating indebtedness of the Belt Company."

To this conclusion the Trust Company excepted on the ground that, in view of other conclusions which the master reached adverse to it, it was unnecessary for him to determine that issue. A consideration after argument of all the facts relating to this issue which the master found in his report convinced this court that the conclusion lawfully deducible from them was that the Southern Company was liable to pay to the Trust Company the debt which the Belt Company owed it. Counsel for the Southern Company now insist that this court was without power to consider or correct this conclusion of the master which the court below followed, and that the Trust Company must suffer the loss of this amount because its counsel did not state in its exception that the conclusion was wrong on the merits of the issue. They invoke the conceded general rule that where no exception is taken to the master's report it will be deemed to be true, and where exceptions to parts of it are taken the parts to which no exception is taken will stand as correct and will not be open to review in an appellate court. Burns v. Rosenstein, 135 U. S. 449, 10 Sup. Ct. 817, 34 L. Ed. 193; Provident Life & Trust Co. v. Railway Co., 177 Fed. 854,

859, 101 C. C. A. 68. But this rule, like most rules of law or practice, is not without its exceptions. In Sheffield, etc., Ry. Co. v. Gordon, 151 U. S. 285, 291, 14 Sup. Ct. 343, 344 (38 L. Ed. 164), the Supreme Court, while holding the exceptions in that case insufficient to present the questions argued, said:

"It is true that, if the report of the master is clearly erroneous in any particular, it is within the discretion of the court to correct the error; but we see no occasion for exercising such discretion in this case."

In 2 Daniell's Chancery Pleading & Practice, at page 1314, it is said that it is entirely discretionary with the court to grant an opportunity to except to a report after it has been absolutely confirmed.

[2] Counsel also claim that by the Trust Company's exception they were induced to forego a review of the finding of the master that the Belt Company was indebted to the Trust Company, and that thereby an equitable estoppel from reviewing the issue of the liability of the Southern Company was created. But suits in chancery are tried and reviewed in view of the fact that a court of equity has and frequently exercises the power where justice may thereby be done, to grant to litigants the right remedy although they have sought the wrong one. Clark v. Clark, 62 N. H. 267, 272; Hardin v. Boyd, 113 U. S. 756, 5 Sup. Ct. 771, 28 L. Ed. 1141; Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co., 142 U. S. 396, 414, 415, 416, 12 Sup. Ct. 188, 35 L. Ed. 1055; Bradford v. Bank, 13 How. 57, 69, 70, 14 L. Ed. 49; Walden v. Bodley, 14 Pet. 156, 164, 10 L. Ed. 398; Moran v. Hagerman, 64 Fed. 499, 503, 504, 12 C. C. A. 239.

[3] As an appeal in equity in the federal courts results in a trial de novo, the appellate court is not, in our opinion, so powerless that it is compelled to affirm an unjust decree; nor is the appellant so conclusively estopped that it may not attack such a decree by the fact that it gave a wrong reason for its exception to the erroneous conclusion of the master it assails.

[4] Moreover, the conclusion here challenged was a mere deduction from the facts disclosed in the master's report, and, where it appears on the face of the report that the master has drawn an erroneous conclusion from the facts he found, the absence of an exception does not disable the court from correcting the error and entering a just final decree. 2 Daniell's Chancery Pleading & Practice, *p. 1310; 17 Encyc. of Pleading & Practice, 1048; Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 40 Fed. 476, 477; Burke v. Davis, 81 Fed. 907, 910, 26 C. C. A. 675, 678; Haymond v. Murphy, 65 W. Va. 616, 64 S. E. 855, 857; Hayes v. Hammond, 162 Ill. 133, 44 N. E. 422, 423; Hurd v. Goodrich, 59 Ill. 450, 456; Von Tobel v. Ostrander, 158 Ill. 499, 42 N. E. 152, 153. The contention that the Trust Company was estopped from seeking a correction of this error and that this court was powerless to correct it does not seem to be well founded, and this court is unwilling to affirm what it deems an unjust decree on account of the defect in the exception.

2. It is conceded that by the transaction described in the former opinion of this court and deemed by it violative of the rights of the Trust Company, a creditor of the Belt Company, if that transaction be

valid, was deprived of legal recourse to the property of the Belt Company to obtain payment of that company's debt to the Trust Company of about $360,000. At that time the Southern Company, by an exchange of its stock and bonds for the stock and bonds of the Belt Company, and by a formal foreclosure by itself, as holder of about 89 per cent. of its bonds, by means of its representative, the Provident· Company, trustee for the bondholders, against and with the consent of itself as the holder of about 97 per cent. of its stock, and by a foreclosure sale of the property of the Belt Company to itself obtained the title to the Belt Company's property to itself, the bondholders of the Belt Company secured about $1,330,000 par value of the bonds and $250,000 of the preferred stock of the Southern Company, aggregating at their par value $1,580,000 for their $1,000,000 par value of bonds of the Belt Company, and the stockholders of the Belt Company secured for their $4,750,000 par value of the stock of that company about $1,187,500·par value of the preferred stock and about $3,562,500 par value of the common stock, in all about $4,750,000 par value of the stock of the Southern Company.

[5] The following propositions of law are deemed incontestable:

"A reorganization of an insolvent railroad company, by which both its mortgage bondholders and its stockholders, in exchange for their bonds and stocks, are given an interest in the new company, which purchases the property of the old company at a foreclosure sale made pursuant to such plan of reorganization and by the consent of the old company and its stockholders, is fraudulent in law as to unsecured creditors of the old company whose claims are left unpaid, and renders the new company liable for the claims of such creditors, at least to the extent of the value of the interest in the new company secured by the stockholders of the old company." ، Northern Pacific Ry. Co. v. Boyd, 177 Fed. 804, 101 C. C. A. 18; Luedecke v. Des Moines Cabinet Co., 140 Iowa. 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616; Hurd v. New York & Commercial Steam Laundry Co., 167 N. Y. 89, 60 N. E. 327.

Where such a transaction is consummated without offering to the unsecured creditor a fair share of the benefits to be derived from the vesting of the title in the purchaser at the foreclosure sale, the intent or purpose to deprive him of recourse to the property to collect his debt becomes immaterial and the fact that it has that effect charges the purchaser with liability.

"As against him the sale is void in equity; regardless of the motive with which it was made; for if such contract reorganization was consummated·in good faith and in ignorance of the existence of the creditor, yet when he appeared and established his debt the subordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized company." Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 502, 33 Sup. Ct. 554, 559 (57 L. Ed. 931).

"For, if purposely or unintentionally a single creditor was not paid or provided for by the reorganization, he could assert his superior rights against the subordinate rights of the old stockholders in the property transferred to the new company. They (the stockholders of the old company) were in the position of insolvent debtors who could not reserve an interest as against creditors. Their original contribution to the capital stock was subject to the payment of debts. The property was a trust fund charged primarily with the payment of corporate liabilities. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditors was invalid. Being bound by the debts, the purchase of

their property, by their new company, for their benefit, put the stockholders in the position of a mortgagor buying at his own sale. If they did so in good faith and in ignorance of Boyd's claim they were none the less bound to recognize his superior right in the property, when years later his contingent claim was liquidated and established." Northern Pacific Ry. Co. v. Boyd, 228 U. S. 504, 33 Sup. Ct. 560, 57 L. Ed. 931.

"No such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. * * * Any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of prior rights of either class of creditors comes within judicial denunciation." Louisville Trust Co. v. Louisville, etc., Ry. Co., 174 U. S. 674, 683, 684, 19 Sup. Ct. 827, 830 (43 L. Ed. 1130).

The transaction in hand, if valid, had the effect to deprive the creditors of the Belt Company of and to secure to the stockholders of that company out of its property the value of $1,187,500 par value of the preferred stock and $3,562,500 par value of the common stock of the Southern Company, and upon its face it seems to fall within the denunciation of these rules of law.

But counsel for the Southern Company argue that, although the completed transaction has the effect of an illegal proceeding, it is not such because it is composed of two independent and valid transactions, to wit: (1) The organization in March, 1900, of the Southern Company and the exchange of the bonds and stock of the Belt Company for the bonds and stock of the Southern Company, so that by April 1, 1900, the latter had acquired 97 per cent. of the stock and 89 per cent. of the bonds of the Belt Company, and the taking possession of the property of the Belt Company by the Southern Company by virtue of its ownership of these bonds and stock on April 1, 1900, when it filled the offices of the Belt Company with its chosen agents and proceeded to control and operate it, and (2) the filing on September 6, 1900, by the Provident Trust Company, the trustee in the Belt mortgage, at the instance of the Southern Company, the owner of 89 per cent. of the bonds, of the bill to foreclose the mortgage of the Belt Company, 97 per cent. of whose stock was owned by the Southern Company, the appearance and consent of the Belt Company on the same day to the appointment of receivers of its property, its answer on October 19, 1901, admitting the material averments of the bill, the decree on November 6, 1901, of foreclosure and sale of the Belt property and the sale thereof on December 31, 1901, under this decree to the Southern Company, the owner of nearly all its bonds and stock. The contention is that, while the former transaction was the result of the scheme of reorganization, the latter was independent and free from the influence thereof, and that each of these transactions taken by itself, as counsel insist they should be, is free from any just objection by any creditor of the Belt Company.

The plan of reorganization was made November 7, 1899, and it became effective December 20, 1899. This plan was made a part of the reorganization agreement, and it stated that it was expected and intended that the property of the Gulf Company would be purchased by the reorganization committee, that a successor of the company would

be organized to which this property and the stocks and bonds of the Belt Company deposited under the plan would be conveyed, that all this property was to be made subject to the mortgage of the new company, and that it was "intended, as soon as practicable, that the new company acquire the property of the terminal companies in fee and bring them directly under the lien of the mortgage." It was then one of the objects of the scheme of reorganization which the committee and the Southern Company, which it organized, were empowered and expected to carry into effect, that the latter company should acquire the property of the Belt Company "in fee" and bring it "directly under the lien of the mortgage," and the acquisition of the stocks and bonds of that company and their pledge under that mortgage were but the means to the accomplishment of this end which the plan contemplated.

It is conceded that the organization of the Southern Company, its purchase of the Gulf Company property, its exchange of its stocks and bonds for those of the Belt Company, and its possession and control of its property on April 1, 1900, by means of its ownership of this stock, were steps in the execution of the scheme. But the reorganization committee did not cease its work until October 1, 1900, and before that date the Southern Company by its representative, the Provident Company, had, on September 6, 1900, commenced the suit to foreclose the Belt mortgage and to put its property in the hands of receivers and had caused the Belt Company to consent to the receivership. For what purpose did the Southern Company take these steps? It had the possession and absolute control of the Belt property by its ownership of 89 per cent. of its bonds and 97 per cent. of its stock. A default on its bonds was in reality a default of itself to itself. Foreclosure could give it no more power over the Belt Company than it already had. For what purpose then was the foreclosure? Evidently to carry out the reorganization agreement, as it was within the power and as it was the duty of the committee and of that company, its creature, to do, to acquire the property of the Belt Company in fee and bring it directly under the lien of the mortgage. Why did the Southern Company exchange its stock for the stock of the Belt Company? Was it not for the purpose of silencing the opposition of the Belt stockholders to the coming foreclosure, and to its acquisition of the fee of the Belt Company's property, and was not the scheme of reorganization the primary cause, the vesting of the fee of the Belt property in the Southern Company by the foreclosure the object and effect of that scheme, and the exchange of the stock and the foreclosure of the Belt mortgage the means contemplated and authorized by that scheme to attain that end? To the minds of the members of this court the record in this case leaves no alternative but to answer these questions in the affirmative.

Moreover, the property of the Belt Company was a trust fund. The stockholders of that company were trustees charged with the duty to apply that property to the payment of the claims of the trust company and of the other creditors of the Belt Company before they took to themselves any share in or benefit therefrom. When the Southern

Company took their stock and gave them $4,750,000 par value of its stocks and bonds for their interest in the property of the Belt Company, it stepped into their shoes and became a trustee for the creditors of the Belt Company with plenary notice that the interest of those creditors in the property was at least as much as the value of the stocks and bonds it was giving for the interest of the stockholders, for the rights of the creditors in the Belt property were prior and superior to those of the stockholders. By virtue of the plan of reorganization the Southern Company had become such trustee. The agreement of reorganization and its ownership of 89 per cent. of the bonds and 97 per cent. of the stock of the Belt Company gave the committee and the Southern Company unrestricted power to discharge its duty to the creditors of the Belt Company, as their trustee, and to accomplish the object of the agreement regarding this property, the vesting of the fee of it in the Southern Company. They had the power to attain this object in a just and lawful way, to pay, to buy, or to compromise the claims of the creditors, or to offer them a just share in the benefits of the reorganization, a share at least as valuable as that given to the stockholders. They did neither, but, in the face of the danger signal that "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation," the Southern Company proceeded by a foreclosure caused by itself, the owner of 89 per cent. of the bonds, trustee for the creditors, really against and with the consent of itself as such trustee, owner of 97 per cent. of the stock, to obtain against the protest of the Trust Company, whom the court expressly excepted in the decree from its effect, a foreclosure decree and sale of this property in effect by itself as trustee to itself as trustee, and thenceforth to insist that it had thereby secured to itself and deprived its cestuis que trust, the creditors of the Belt Company, of all interest in the property. In view of the fact that the acquisition of the fee of the Belt property by the Southern Company was stated in the reorganization plan and agreement to be one of their intended results, that this result has been obtained, that the exchange of the stocks and bonds were the means specified therein to attain it, and were the means by which the consent decree of foreclosure and sale of the Belt property to the Southern Company was effected, and that this foreclosure and sale were the means by which the intended result of the plan of acquisition of the fee of the Belt properties by the Southern Company was secured, this court is unwilling to hold that the validity of these proceedings can be sustained against the rule that "any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditors, was invalid" (228 U. S. 504, 33 Sup. Ct. 560, 57 L. Ed. 931), by contemplating or treating them as two separate and independent transactions, one consisting of that part of the proceedings conducted before, and the other of that part of the proceedings conducted after, April 2, 1900. They appear to this court to constitute a single transaction instituted, conducted, and consummated pursuant to the preconceived plan to vest the fee of the prop-

erties of the Belt Company in the Southern Company and to bring them directly under the lien of its mortgage.

[6] 3. Counsel for the Southern Company contend that the Trust Company is entitled to no favorable decree for the payment of the liability of the Southern Company to it and to no affirmative relief because it did not obtain a judgment against the Belt Company and a return of nulla bona to an execution before it presented its claim and demanded relief. But that is an objection only to the jurisdiction of a national court in equity of an original and independent bill to charge a fraudulent trustee. A claim of the nature of that made by the Trust Company in the absence of judgment or execution may be presented by intervention in a foreclosure suit and may there, or in any other suit wherein the court has acquired jurisdiction of the subject-matter and the parties, be adjudicated. Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 379, 14 Sup. Ct. 127, 37 L. Ed. 1113. The objection is not tenable here because the decision of the question of the liability of the Southern Company to the Trust Company became, as conceded by counsel for the Southern Company, necessary to the disposition of this case (201 Fed. 817, 120 C. C. A. 121), to which the Trust Company was originally made a defendant against its will. This is now a suit in equity in which the court below and this court have full jurisdiction of the subject-matter and the parties to the controversy regarding this liability, and under a familiar and salutary rule the power is conferred and the duty is imposed upon a court of equity, which has acquired such jurisdiction, to consider and determine all the rights and claims of the parties relating to the subject-matter and to enter a decree that will finally determine them to the end that a multiplicity of suits may be avoided and litigation may cease. Hopkins v. Grimshaw, 165 U. S. 342, 358, 17 Sup. Ct. 401, 41 L. Ed. 739; Sunflower Oil Co. v. Wilson, 142 U. S. 313, 325, 12 Sup. Ct. 235, 35 L. Ed. 1025; Ward v. Todd, 103 U. S. 327, 329, 26 L. Ed. 339; In re Blake, 150 Fed. 279, 283, 80 C. C. A. 167, 173; United States v. Standard Oil Co. (C. C.) 152 Fed. 290, 296; Campbell v. Golden Cycle Mining Co., 141 Fed. 610, 614, 73 C. C. A. 260, 264.

[7] It is contended that the remedy of the Trust Company is limited to a pursuit of the stockholders of the Belt Company who exchanged their stock for the stock of the Southern Company. But the liability of those stockholders is founded on their relation as trustees for the creditors of the corporation. The Southern Company with full notice of their and its liability and duty to the creditors of the Belt Company by the exchange of stock became such a trustee, and by as much as its power over the property of the Belt Company by its ownership of nearly all its bonds, as well as stock, was greater than that of the former stockholders, by so much was its duty to protect the rights and interests of its cestuis que trust, the creditors, higher and more imperative. It owed them the duty to exercise good faith, care, and diligence to secure and deliver to them their full equitable share of the property or the value of that share. Any sale or conveyance of the property to itself whereby they were deprived of and it secured that share, or its value, was a breach of duty and of trust which in-

vokes plenary relief from a court of chancery, and as by its formal foreclosure sale to itself of the property of the Belt Company it took to itself and deprived the creditors of their equitable interest in the property and of the value of that interest, it is not less liable in equity for this breach of trust than were the stockholders with whom it exchanged its stock. The duty and liability of the majority stockholders to minority stockholders is not less than this (Jones v. Missouri Edison Electric Co., 144 Fed. 765, 771, 75 C. C. A. 631, and cases there cited), and their duty to creditors whose equitable rights and interests in the property of the corporation are superior to those of stockholders cannot be less.

Moreover, where the property of a corporation is sold to a purchaser and part or all of the purchase price thereof is paid or distributed to its stockholders to the exclusion of its creditors from a collection of their debts from the property of the corporation, the latter may recover that part of its value from the purchaser with notice, on the ground that the conveyance is fraudulent in law. Central of Georgia Ry. Co. v. Paul, 93 Fed. 878, 882, 884, 35 C. C. A. 639; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 457, 32 L. R. A. (N. S.) 616; Hibernia Ins. Co. v. St. Louis & N. O. Trans. Co. (C. C.) 13 Fed. 516; Grenell v. Detroit Gas Co., 112 Mich. 70, 70 N. W. 413; Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931. And the fact must be constantly borne in mind, in the consideration of this case, that as against the Trust Company the entire transaction was in effect that the Southern Company knowingly purchased and took to itself without even a formal foreclosure the property of the Belt Company and paid the latter's stockholders the value of $4,750,000 of its stock therefor to the exclusion of the Belt Company's creditors therefrom, for by the express provision of the foreclosure decree the Trust Company was excepted from all its effects.

Another argument is that the Trust Company is entitled to no relief because the equitable interest of the creditors in the property of the Belt Company was of no value. This contention is founded on the findings of the master that there was no direct testimony of the fair value of the Belt Company's property at or before the time of the foreclosure, no proof that it was worth more than the $1,000,000 for which it was sold at the foreclosure sale, and therefore that it was sold at its fair market value. The mortgage was $1,000,000, and the deduction is that the equitable interest of the creditors was valueless. But the crucial issue here was not what the fair market value of the mortgaged property was, nor was it how much more the mortgaged property was worth than the amount of the mortgage. Although evidence upon these subjects would have been competent in the consideration of the real issue here in the absence of an estoppel, that issue was: What was the equitable interest of the creditors in the mortgaged property of the Belt Company worth during the execution of the scheme and immediately after the foreclosure sale and the appropriation of it thereby by the Southern Company, the trustee for the creditors, to itself, for a trustee who violates his trust may not prof-

it thereby? Ervin v. Oregon Railway & Navigation Co. (C. C.) 27 Fed. 625, 633; Jones v. Missouri Edison Electric Co., 144 Fed. 765, 779, 75 C. C. A. 631. The creditors were entitled to the highest value their interest had during this time, either for the purpose of sale or for the purpose of preventing a foreclosure of the mortgage upon the Belt property, or for the purpose of compromising their claims or conditioning the foreclosure, or for the purpose of the present or future control of the property.

"If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever." Northern Pacific Ry. Co. v. Boyd, 228 U. S. 508, 33 Sup. Ct. 561, 57 L. Ed. 931.

[8] The report of the master discloses other facts than that he received no direct evidence of the fair market value of the property except the bid at the foreclosure sale, which leave no doubt that the equitable interest of the creditors was worth much more than the amount of the Trust Company's claim, $360,000. That report shows that the Southern Company paid $1,330,000 of its bonds and $250,000 of its preferred stock, or $1,580,000 of its new bonds and stock for the $1,000,000 of the old bonds of the Belt Company. The fact to which counsel call attention, that the new bonds drew but 3 per cent. interest per annum while the old bonds drew 5 per cent., has not been overlooked. But even so, the reorganization committee and the Southern Company would not have given for these old bonds a bonus of 33 per cent. in new bonds and $250,000 in the stock of the Southern Company unless the old bonds had been well secured. The master's report also shows that the Southern Company gave $1,187,500 of its preferred stock and $3,562,500 of its common stock to the stockholders of the Belt Company for their equitable interest in the property of that company, that at the same time stockholders of the Gulf Company paid, and the Southern Company received, $10 per share in cash and an equal number of shares of the stock of the Gulf Company for tens of thousands of shares of the Southern Company's common stock. That stock must therefore have been worth at least the $10 cash per share which was paid for it, and it was worth as much more as the value of the stock of the Gulf Company. The preferred stock of the Southern Company could not have been worth less than its common stock. The Southern Company therefore paid in value at least $475,000 for the equitable interest of the stockholders of the Belt Company in its property when it gave them $4,750,000 of its preferred and common stock for their stock in that company. But the equitable interest of the creditors in the property of the Belt Company was superior to that of the stockholders, and its value could not have been less, and was undoubtedly greater, than the $475,000. That interest was therefore worth more than enough to have paid the $360,000 which the Belt Company owed to the Trust Company, and the Southern Company cannot escape liability on the ground that it was worthless. The fact that at the foreclosure sale, where there was no com-

petition, the Belt Company was bid in at $1,000,000, fails to disprove or to even render doubtful this conclusion, and the Southern Company which gave $4,750,000 of its full paid stock, which it was readily selling for $10 cash per share, and Gulf stock of equal amount, for the inferior stock of the Belt Company, cannot be heard to say that the superior equity of the creditors therein was worthless. Northern Pacific Ry. Co. v. Boyd, 228 U. S. 508, 33 Sup. Ct. 554, 57 L. Ed. 931; Rankin v. Gardner (N. J.) 34 Atl. 935, 937; Garrison v. Monaghan, 33 Pa. 232, 234.

Deliberate consideration has been given to the earnest objection to the consideration by this court of the question of the value of this equitable interest of the creditors in the Belt property on the ground that the master found that there was no direct evidence that the property of the Belt Company was worth more than $1,000,000, and hence that this was its fair value, that no exception was taken to that finding, and that the evidence is not here. But because the finding of the fair market value of the mortgaged property is not conclusive of the value of the creditors' equity therein, and because other facts and findings contained in the master's report, all of which are available to this court for the determination of that issue, have convinced that the value of that equity was more than $475,000, the objection of counsel has not been thought fatal to the consideration and determination of this question.

Counsel say that because the original stockholders of the Belt Company, by the exchange of their stock for that of the Southern Company retained, as they claim, only 3⅓ per cent. of the value of their equitable interest in the Belt property, therefore the Southern Company is liable for only 3⅓ per cent. of that interest. But the measure of the creditors' recovery is the value of the creditors' equity which was diverted from them by their trustees, the stockholders of the Belt Company, including the Southern Company, the successory trustee, and vested in that trustee. If the Southern Company had been the owner of the bonds of the Belt Company only, and knowing the condition and indebtedness of the Belt Company, as it did, had paid to the stockholders of that company $475,000 to the exclusion of the creditors for a conveyance of its property by the Belt Company to the Southern Company, it could not have escaped liability to the creditors of that company for that amount. Much less can it do so when it became owner of nearly all the Belt Company's stock, and in equity a trustee for its creditors. Story's Equity Jurisprudence, §§ 1261, 1262; Grenell v. Detroit Gas Co., 112 Mich. 70, 70 N. W. 413; Camden Interstate Ry. Co. v. Lee (Ky.) 84 S. W. 332, 333; Central of Georgia Ry. Co. v. Paul, 93 Fed. 883, 884, 35 C. C. A. 639; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 457, 458, 32 L. R. A. (N. S.) 616; Hibernia Ins. Co. v. St. Louis & N. O. Trans. Co. (C. C.) 13 Fed. 516, 519.

[9] It is another contention of counsel for the Southern Company that the remedy of the Trust Company in this court of equity is limited to the subjection of the property of the Belt Company in the possession of the Southern Company to the payment of its claim and that

it may not have a decree that the Southern Company pay it. This court does not concede the soundness of this position and the leading case on the subject cited by counsel for the Southern Company does not sustain it. The quotation they make from that case is in these words:

"A sale may be void for bad faith though the buyer pays the full value of the property bought. This is the consequence, where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly, with guilty knowledge. When the fact of fraud is established in a suit at law, the buyer loses the property without reference to the amount or application of what he has paid, and he can have no relief either at law or in equity. When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to—while it scans the transaction with the severest scrutiny—looks at all the facts, and, giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others, it allows a security to stand for the amount advanced upon it. In others, it compels the buyer to account only for the difference between the under price which he paid and the value of the property. In others, although he may have paid the full value, and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller, it may hold him excused from further responsibility. The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts to the injury of his creditors, by means of the fraud." Clements v. Moore, 6 Wall. 299, 312 (18 L. Ed. 786).

The application of the principles there announced in that suit, which was in equity, was this: Nicholson, the debtor, had sold his property to Moore for $6,310.35 to defraud his creditors, and Moore had paid Nicholson for the goods in cash and his own notes which Nicholson had disposed of and Moore had sold the goods. But Nicholson had applied all of the $6,310.35 to the payment of his debts except $1,500. The Supreme Court held that Moore was liable to the creditor Clements for that amount. By the same mark the Southern Company became liable to the Trust Company to the extent of its claim for the value of the $4,750,000 of its stocks which it issued to the stockholders of the Belt Company to secure the property of the Belt Company and divert it from its creditors. Central of Georgia Ry. Co. v. Paul, 93 Fed. 883, 884, 35 C. C. A. 639; Camden Interstate Ry. Co. v. Lee (Ky.) 84 S. W. 332, 333.

The question, however, is not material in the case at bar because the transaction was a conveyance of the property of the Belt Company in fraud of creditors and a breach of trust by the Southern Company, which company, with full knowledge of all the facts, actively participated in the entire transaction and thereby acquired the property of the Belt Company, so that that property and the improvements the Southern Company has made thereon, free from the $1,000,000 Belt mortgage and free from any charge for the expenses which the Southern Company has made thereon, stands in its hands charged with a trust to pay the claim of the Trust Company against the Belt Company which the court may execute by a seizure and sale by its master or receiver. Railroad Co. v. Soutter, 80 U. S. (13 Wall.) 517, 522, 524, 20 L. Ed.

543; Guckenheimer v. Angevine, 81 N. Y. 394, 397; Goble v. O'Connor, 43 Neb. 49, 61 N. W. 131, 132.

And if the Southern Company has disposed of the property or destroyed it, or placed it beyond the reach of the Trust Company or the court, or given a mortgage or incumbrance' upon it to a party without notice, the court has plenary power, and it is its duty to require the Southern Company to account for and pay over the proceeds of the property or the value of it, or the proceeds of the mortgage, or the amount of it, to the extent of the Trust Company's claim, and to so conduct its proceedings and mold its decrees that full relief may be secured by the Trust Company. And as the property of the Belt Company was worth many times the amount of the claim of the Trust Company at the time of its transfer to the Southern Company, the ultimate result will be the same whether the decree be for the seizure and sale of the Belt property or for the payment of the claim of the Trust Company by the Southern Company, for it must ultimately be paid either out of the property in its hands or by the Southern Company itself. 20 Cyc. 630, 631; Doherty v. Holliday, 137 Ind. 282, 32 N. E. 315, 317, 36 N. E. 907, 908; Jones v. Reeder, 22 Ind. 111; Swinford v. Rogers, 23 Cal. 234, 237; Mason v. Pierron, 69 Wis. 585, 34 N. W. 921, 925; Blair v. Smith, 114 Ind. 114, 15 N. E. 817, 819, 820, 5 Am. St. Rep. 593; Williamson v. Williams, 11 Lea (Tenn.) 355; Murtha v. Curley, 90 N. Y. 372; Post v. Stiger, 29 N. J. Eq. 554, 561; Chamberlin v. Jones, 114 Ind. 458, 16 N. E. 178, 179; Muskegon Valley Furniture Co. v. Phillips, 113 Ala. 314, 21 South. 822, 823; Coale v. Moline Plow Co., 134 Ill. 350, 25 N. E. 1016, 1018; Dilworth v. Curts, 139 Ill. 508, 29 N. E. 861, 864; Hulley v. Chedic, 22 Nev. 127, 36 Pac. 783, 786, 58 Am. St. Rep. 729; Morrell v. Miller, 28 Or. 354, 43 Pac. 490, 494, 45 Pac. 246.

[10] 4. Counsel argue with great force and ability that the Trust Company is estopped from enforcing against the Southern Company its claim for its breach of trust to it as a creditor of the Belt Company:

(1) Because it signed and induced others to sign, the trust agreement which contained this paragraph:

"No right is conferred, nor any trust, liability or obligation (except the agreements herein contained in favor of the holders of certificates of deposit hereunder) is created by this agreement or the plan, or is assumed hereunder, or by or for any new company in favor of any bondholder or any other creditor or any holder of any claims whatsoever against the said companies, nor in favor of any company now existing or to be formed hereafter (whether such claim be based on any bonds, coupon stocks, securities, lease, guaranty or otherwise) with respect to any security deposited under this agreement or any moneys paid to or received by the committee or by the depositor hereunder, or with respect to any property acquired by purchase at any foreclosure sale, or with respect to any new certificates to be issued hereunder, or with respect to any other matter or thing."

(2) Because it was one of the depositories under the agreement, and on June 26, 1900, it accepted bonds and stock of the Southern Company in exchange for bonds and stock in the Gulf Company and other companies reorganized under the agreement, and especially because it accepted stock of the Southern Company in exchange for stock of the

Belt Company which it held, and (3) by its laches in presenting its claim against the Southern Company.

It may be that if, when the Trust Company signed the agreement, that instrument had disclosed a purpose or had by its terms required the committee, or the stockholders of the Belt Company, or their successory trustee, the new company, the Southern Company, to violate their trust and divert the equity of the creditors of the Belt Company in its property to its stockholders, the Trust Company's signature to it, its action as a depository of the bonds and stocks under it, and its exchange of its Belt Company stock for the Southern Company stock, might have wrought an estoppel against it. But the agreement must be read in the light of the law which was necessarily a part of it. It was to execute a plan, which it disclosed, to transfer the property of the Belt Company to a new company by means of the exchange of the stock of the new company for that of the Belt Company. The law was that as against creditors of the Belt Company such a plan could be lawfully executed in but one way, and that was by offering and, if accepted, by paying to the creditors of the Belt Company either in cash or in stock of the new company, or in some other property at least as much in value as the stockholders should receive, and, in the absence of such an offer or payment the transfer would be fraudulent and voidable as to the creditors. Unless there was in the agreement some term or provision which required the committee or the Southern Company to violate this law and to make a transfer fraudulent and voidable as to the creditors, the legal presumption was that the agreement contemplated, and that the committee and the Southern Company would make, such an offer and payment to the creditors, and upon that presumption the Trust Company had the right to rely when it signed the agreement and thenceforth until it was clearly notified to the contrary. The legal presumption was that the committee and the new company, the Southern Company, which was to succeed to the trusteeship of the stockholders of the Belt Company, and all others executing the agreement would obey the law, would refrain from making the transfer of the property from the Belt Company fraudulent and voidable, and would make it fair, just, and valid. The Trust Company had the right to calculate the natural and probable result of its signature to the agreement and of all its acts and omissions in reliance upon this presumption. Indeed, it could reckon upon no other, for it is alike impracticable and impossible to predicate and administer the rights and remedies of men upon the theory that their associates and fellowmen will either violate the laws or disregard their duties. Cole v. German Savings & Loan Co., 124 Fed. 113, 119, 59 C. C. A. 593, 599, 63 L. R. A. 416; Little Rock & M. R. Co. v. Barry, 84 Fed. 944, 950, 28 C. C. A. 644, 650, 43 L. R. A. 349; Burt v. Advertiser Newspaper Co., 154 Mass. 238, 247, 28 N. E. 1, 13 L. R. A. 97; American Bridge Co. v. Seeds, 144 Fed. 605, 609, 75 C. C. A. 407, 411, 11 L. R. A. (N. S.) 1041.

The reorganization agreement has been searched in vain for any provision which required or notified the committee or the new company that they must violate the law and make the transfer fraudulent and

void as to creditors. On the other hand, that agreement declared that the results of its execution would be: (a) The placing of the properties of the Belt Company, the Gulf Company, and the Dock Company under one corporate ownership, management, and control; "(b) the payment of the floating debt and the existing car trust obligations." It set apart $475,000 for the payment of floating debts; it expressly authorized the committee to acquire, hold, or extinguish "any obligation in the nature of floating debt or otherwise against any company or property embraced in said plan," and under this power the committee actually expended $1,164,172.50. It declared that it was intended to confer on the committee any and all powers which they might deem necessary or expedient towards carrying out and promoting the purposes of the plan and the agreement, and that the methods to be adopted for carrying out the reorganization consolidation and unification of, the properties should be entirely discretionary with the committee. The committee and the Southern Company, therefore, had ample power to realize and pay to the creditors of the Belt Company the value of their equity in the property of the Belt Company before they transferred that property to the Southern Company. Let us now turn to the paragraph in the agreement on which counsel for the Southern Company rely for their estoppel by deed. So far as material it provides that:

"No right is conferred, nor any trust, liability or obligation * * * is created by this agreement or the plan, or is assumed hereunder, or by or for any new company in favor of * * * any holder of any claims whatsoever against the said companies, * * * with respect to any property acquired by purchase at any foreclosure sale."

There are two reasons why the Trust Company did not, by signing this paragraph, deprive itself of its equity in the property of the Belt Company, which it held as the cestui que trust of its stockholders, nor of its claim against the Southern Company, the stockholder's successory trustee: First, if that equity and trust were created or conferred by or under the agreement, they were created and conferred, not by the just and lawful execution of that agreement, but by the inequitable and fraudulent appropriation of the Trust Company's equity in the property to the benefit of its stockholder or stockholders, and the paragraph in question barred the Trust Company from asserting only such rights, trusts, liabilities, and obligations as arose out of the lawful and equitable execution of its contract. It did not bar it from enforcing its claims accruing from illegal or inequitable acts or omissions of those engaged in the execution of the agreement. If the committee or any one engaged in such execution had unlawfully appropriated to their or his benefit the property, money, or securities of signers of the contract which came to them or him under the agreement, the signers would not have been estopped by that paragraph from recovering the property or from enforcing the personal liability of the appropriators. Second, the Trust Company's right, trust, and equity in the property of the Belt Company acquired by the Southern Company "by purchase at any foreclosure sale" was neither created nor conferred by the reorganization agreement. It existed in all its force and inhered in the

Belt Company's property by virtue of the relation of the Trust Company as a creditor of the Belt Company to the latter's stockholders before the agreement was made, and there it still inheres, so that it did not fall within the terms of the paragraph in question, and therefore was not affected thereby. Nor did the liability and obligation of the Southern Company for its breach of that trust now here in suit fall within the terms of that paragraph, for it was not created by that agreement, but by the Southern Company's subsequent transfer of the equity of the creditors of the Belt Company to itself, its stockholder, and the trustee for its creditors without securing and paying to them the value of that equity. For these reasons the court is of the opinion that the Trust Company was not estopped by its signature to and activity in inducing others to sign the agreement from enforcing its claims as a creditor of the Belt Company against the Southern Company and against the property of the Belt Company in its possession or control.

[11] Was the Trust Company equitably estopped from presenting and enforcing its claim by its promotion of the reorganization agreement, its participation in its execution and its acceptance on July 26, 1900, of stock of the Southern Company in exchange for its stock in the Belt Company and its acceptance of stock and bonds of the Southern Company in exchange for its stock and bonds in the Gulf Company and some of the other reorganized companies, or by its laches? Laches is equitable estoppel under another name, and these two claims of estoppel will be considered together. A statement in chronological order of the salient facts material to the issue here presented will greatly aid in its disposition.

The plan of reorganization was made on November 7, 1899. It became effective on December 20, 1899. In December, 1899, or during the early part of the year 1900, the Trust Company requested a prominent member of the reorganization committee to adjust or settle and pay its claim against the Belt Company, and he answered that it was asserted that the Belt Company did not owe the Trust Company anything, that an examination of the books of the Belt Company and the books of the Trust Company was being made and that when that was completed he would take up the question of whether anything could be done towards an equitable settlement of the claim. On February 5, 1900, the decree of foreclosure and sale of the Gulf Company's property was rendered. On March 19, 1900, the Southern Company was incorporated. On March 19, 1900, the Southern Company purchased the property of the Gulf Company at its foreclosure sale. By April 1, 1900, it had acquired, by its exchange of its stocks and bonds for those of the Belt Company, 97 per cent. of the Belt Company's stock and 89 per cent. of its bonds. On April 1, 1900, it placed its chosen agents in the offices of the Belt Company and took possession of its books and property by virtue of its ownership of its stock. On June 6, 1900, the reorganization committee purchased of the Trust Company and paid it $35,000, which they applied in part payment of the debt of the Belt Company to it, for certain shares of the stock of the Terminal Company and of the Airline Company, which the Trust

Company held in pledge to secure the payment of its claim against the Belt Company. On July 26, 1900, the Trust Company exchanged its stocks and bonds in the old reorganized companies for the stocks and bonds of the Southern Company. On September 1, 1900, the Trust Company gave notice of its proposed sale on September 7, 1900, of the securities which the Belt Company had pledged to it to secure the payment of the latter's debt. On September 6, 1900, the Provident Company, the trustee in the mortgage of the Belt Company and in duty and in reality the agent of the Southern Company which held 89 per cent. of the bonds of the Belt Company and 97 per cent. of its stock, brought a suit to foreclose the mortgage, for the appointment of receivers of the Belt Company's property, and for an injunction against its sale or disposition. On September 6, 1900, the Belt Company appeared in that suit and consented to the appointment of receivers. On September 6, 1900, the Cambria Company, with the consent of the Belt Company, the agent of the Southern Company which held 97 per cent. of its stock, recovered a judgment and obtained a return of nulla bona to an execution against the Belt Company.

On September 6, 1900, the Cambria Company commenced the suit here in hand against the Belt Company and against the Trust Company to enjoin the latter company from selling its collaterals and applying their proceeds to the payment of the debt of the Belt Company, a suit which it founded on the averment, which has been adjudged untrue, that the Belt Company was not indebted to the Trust Company, and on other allegations so baseless that it has become clear that the Cambria Company had no cause of action against the Trust Company. On September 6, 1900, the Belt Company, the hand of the Southern Company, appeared in the Cambria suit, and on the same day the Trust Company was restrained by the court from selling its collaterals, and receivers of the property of the Belt Company were appointed in this suit. On November 5, 1900, the Trust Company answered and set up its claim against the Belt Company and the pledging of its collaterals. On December 3, 1900, the Cambria Company filed a replication to that answer. On that day the issue of the indebtedness of the Belt Company to the Trust Company was made in this suit, and that issue really existed then between the Trust Company and the Southern Company, for the Southern Company by its ownership of 97 per cent. of the Belt Company's stock controlled it and in all subsequent proceedings directed its course, and is as much bound by its action as though it had been the Belt Company itself. This issue was referred to the special master, and it was not until May 21, 1910, after testimony had been taken for years and after a record of approximately 34,000 pages had been accumulated, that the Trust Company succeeded in obtaining an adjudication thereof, and that issue was first determined by the court below a few days later. It will be interesting to note a few of the proceedings which resulted in this delay. Before the Trust Company reached the decision of the master, more than 15 pleadings were filed in this case by other parties to this suit, and the Trust Company was compelled to file 6.

On October 20, 1900, the Trust Company filed a petition in the Prov-

ident Company's foreclosure suit for leave to be made a party and to plead therein, wherein it set forth its claim against the Belt Company, that the Southern Company would cause the Belt Company to waive all defenses and to consent to a foreclosure of the mortgage upon its property to the detriment of the Trust Company and the creditors of the Belt Company. On October 22, 1900, the Provident Company amended its bill and asked that the Trust Company be made a defendant, and the court so ordered. On November 5, 1900, the Trust Company answered the Provident Company's bill and in its answer set forth the debt of the Belt Company to it, the control of the Belt Company by the Southern Company, and its purpose to waive all defenses to and to consent to the foreclosure of the Belt Company's mortgage and the sale of its property for the purpose and with the effect of appropriating the equity of its unsecured creditors to itself. On September 12, 1901, and again on October 14, 1901, the Trust Company applied for leave to file its amended and supplemental answer, in which it set forth the debt of the Belt Company to it, the facts regarding the reorganization agreement, the organization of the Southern Company, its exchange of its stock for the stock of the Belt Company, and its purpose, by the control of the Belt Company and of its bonds and stock, to appropriate to itself the equity of the creditors of the Belt Company in its property by means of the foreclosure suit, and prayed that the bill of the Provident Company be dismissed, and for such further orders and decrees as it was entitled to receive. On October 19, 1901, the court ordered the application denied on condition that the Provident Company should file a stipulation to the effect that the decree of foreclosure to be rendered in its case should not bar the right of the Trust Company to plead and insist in any future litigation that the Southern Company was legally and equitably bound by reason of the method by which it would obtain the property of the Belt Company to pay the debt of the Belt Company to the Trust Company. On October 17, 1901, the Provident Company filed such a stipulation, and the court denied the Trust Company leave to file its amended answer. On October 19, 1901, the Trust Company presented to the court in the Provident Company suit a petition for leave to prepare and file a cross-bill setting forth the facts stated in its amended answer and praying for an adjudication of its claim against the Belt Company for the sale of its collaterals and for a provision in the decree of foreclosure that any purchaser of the Belt Company's property at the sale thereunder should take and hold it subject to the payment of the Trust Company's claim and to the payment of the claims of all the unsecured creditors of the Belt Company. On October 19, 1901, the court denied this application. On October 19, 1901, the Belt Company filed its answer whereby it admitted the averments of the Provident Company in its bill. On November 6, 1901, the court entered the decree of foreclosure and sale of the Belt Company which contained the express condition stipulated by the Provident Company that the decree should not bar the right of the Trust Company to recover of the Southern Company personally or out of the property of the Belt Company the amount of its claim against that Company. On November 20, 1901, the Trust Company and the Belt

Company and its receivers stipulated in the Cambria Company's suit that the accounting between the Trust Company and the Belt Company should be expedited and that a judgment should be entered in that suit against the party found to be the debtor. On December 31, 1901, the Southern Company bid in the Belt property at the Provident Company's foreclosure sale, and the master conveyed it to the Southern Company.

On February 27, 1905, the Southern Company filed an intervening petition in the Cambria Company's suit by which it sought to recover certain collaterals pledged by the Belt Company to the Trust Company to secure the Belt Company's debt and certain moneys which the Trust Company had collected. On March 7, 1905, the Trust Company filed its answer to this petition, wherein it denied the validity of the claim of the Southern Company, and alleged that by virtue of the proceedings which resulted in the foreclosure sale and conveyance of the Belt Company's property to the Southern Company that property remained bound, and the Southern Company became bound to pay the Trust Company's claim against the Belt Company. On May 1, 1905, the Southern Company filed an amended intervening petition seeking substantially the same relief on the same grounds. On May 25, 1905, the Trust Company answered it in substantially the same way as it answered the Southern Company's former petition, and the issues thus formed were, by order of the court, referred to the special master for hearing and report. Then followed objections and arguments and testimony, until on May 21, 1910, the master finally filed his report, and in a few days thereafter the court rendered its decree. The Trust Company, however, was not idle during this time, nor did it limit its endeavors to enforce its claim to the prosecution of it in the court below. On March 15, 1905, and on March 28, 1905, it commenced actions at law in a state court against the Southern Company for certain parts of its claim against the Belt Company. On July 3, 1905, the Southern Company filed a supplemental bill in the Provident Company's foreclosure suit to enjoin the Trust Company from prosecuting those actions. On August 29, 1905, the Circuit Court ordered the Trust Company enjoined from prosecuting it. On May 31, 1906, this court reversed that order. In May, 1907, the Southern Company made a motion in the state court to stay the proceedings in these actions at law, and in June, 1907, that motion was denied and the cases were set for trial on December 2, 1907. On November 16, 1907, the Southern Company filed another bill to enjoin the Trust Company from prosecuting those actions and the court below granted the injunction. On April 2, 1909, this court reversed that order.

Where is the evidence of any laches of the Trust Company in these proceedings? It presented to one of the members of the committee its claim against the Belt Company for adjustment and settlement and was told that when the examination of the books were completed he would take up the matter whether anything could be done towards an equitable settlement of its claim, and there that matter rested until the Trust Company was enjoined from selling its collaterals in September, 1900. By a sale of some of its collaterals to the committee it collected

and applied the proceeds thereof to its claim against the Belt Company in June, 1900. It gave notice of its sale of its remaining collaterals on September 1, 1900, and was enjoined from proceeding in the baseless suit of the Cambria Company, a suit based on a judgment to which the Southern Company consented in the name of the Belt Company, and it is difficult to wink so hard as not to see that the Cambria suit was in reality the suit of the Southern Company. Twice in October, 1901, it set forth in answers to the Provident Company's suit its claim against the property of the Belt Company and against the Southern Company, and prayed the adjudication and payment thereof, to be met by a denial by the court doubtless secured by the objections of the Provident Company and by that company's stipulation that the decree should not foreclose, bar or affect the Trust Company's claim against the Southern Company, or the property of the Belt Company which it should acquire thereunder. On October 19, 1901, it applied for leave to plead this claim in a cross-bill in that suit and to pray for a decree that its claim should be paid out of the property of the Belt Company, to be met by like denial. In this way the Trust Company was prevented from obtaining a hearing on the merits and an adjudication of its claim in the foreclosure suit and subjected to the objection to an original bill which it might otherwise have brought against the Southern Company that it had no judgment against the Belt Company and no execution returned unsatisfied thereon. Therefore it pressed for that judgment. November 20, 1901, it joined the Belt Company and its receivers in a stipulation to expedite the trial of that issue and the entry of such a judgment, but new pleadings, tens of thousands of pages of testimony, delayed the result. When that result seemed nearer, and on February 27, 1905, the Southern Company intervened and claimed some of the Trust Company's collaterals, and on March 7, 1905, the Trust Company answered the intervening petition and again pleaded and pressed its claim against the Southern Company. On March 17, 1905, and March 28, 1905, apparently despairing of reaching an adjudication in this suit in equity, it brought actions at law against the Southern Company upon its claim, but was prevented from trying them by injunctions procured and other proceedings conducted by the Southern Company until April 2, 1909, when the last injunction against its proceeding in the state court was reversed by this court. Meanwhile the Trust Company had pressed the issues in this suit through the hearings, they had been submitted to the master, and on May 21, 1910, he found that the Belt Company was indebted to the Trust Company in 1900, and that the amount of that debt with interest to June 22, 1910, was $639,658.86. There is much evidence of promptness, diligence, and persistence, and none of laches, on the part of the Trust Company in the printed record before us. Nor does it lie in the mouth of the Southern Company to make or urge a charge of laches here. By its use of 89 per cent. of the bonds of the Belt Company which the Provident Company was bound to represent in the foreclosure suit, and of 97 per cent. of the stock of the Belt Company, it controlled the action of each of those companies in that suit. By means of those companies it prevented the hearing and adjudication of

the Trust Company's claim upon its answers and upon its application to file a cross-bill in that suit. By the Belt Company's consent to a judgment against it in favor of the Cambria Company it laid the technical foundation of the Cambria Company's unwarranted suit which prevented the Trust Company from selling its collaterals, and held the issue of the Belt Company's indebtedness to it suspended for more than eight years. It prevented the trial of that issue in the actions which the Trust Company brought in the state courts in 1905 by injunctions it procured from the court below, and there is no equity in its claim that the Trust Company unduly delayed the presentation or the prosecution of its claim against it or against the property of the Belt Company.

But counsel argue that the Trust Company is equitably estopped from maintaining its claim by the fact that it was one of the depositories under the reorganization agreement, that it persuaded others to sign it, and that on July 26, 1900, it exchanged its $76,972 par value of stock in the Belt Company and the stocks and bonds it held in the Gulf Company and the other reorganized companies for $1,480,-909 par value of stock of the Southern Company. Let us see:

[13] The indispensable elements of an "estoppel in pais" are: (1) Intentional or reckless misrepresentation of a known and material fact inconsistent with the subsequent claim of him who makes the misrepresentation; (2) ignorance of the truth and absence of equal means of knowledge of it by the party who claims the estoppel; (3) action by the latter induced by the misrepresentation; and (4) injury to the latter if the truth is permitted to be proved. Bigelow on Estoppel (4th Ed.) p. 679; Illinois Trust & Sav. Bank v. City of Arkansas City, 76 Fed. 271, 293, 22 C. C. A. 171, 193, 34 L. R. A. 518; Farmers' & Merchants' Bank v. Farwell, 58 Fed. 633, 638, 639, 7 C. C. A. 391, 396, 397; New York Life Ins. Co. v. McMaster, 87 Fed. 63, 66, 67, 30 C. C. A. 532, 535, 536. The estoppel here probably lacks all, and it certainly lacks at least three, of these essential elements: (1) The requisite misrepresentation of any material fact which the Trust Company knew; (2) ignorance or absence of equal means of knowledge of that fact by the Southern Company or its stockholders and bondholders; and (3) injury to them if the truth is permitted to be proved. First, the reorganization agreement, as we have seen, disclosed a scheme whereby the property of the Belt Company might be honestly and lawfully vested in the Southern Company by offering, and if the offer was accepted by paying, to the creditors of that company at least as much in value as the scheme offered to the stockholders of the Belt Company. The Trust Company presented its claim against the Belt Company to one of the committee and was told before it made its exchange that the indebtedness of the Belt Company was denied, but was under investigation, and that when that investigation was completed he would take up the claim and see if anything could be done about its settlement, and there the matter rested until after the exchange of stock was made. Meanwhile the Southern Company had the books of the Belt Company evidencing the state of the account between the Belt Company and the Trust Company in its possession. The trust

Company never made any representation that it ..ad no claim against the Belt Company nor that it would not press it for payment by the committee, by the Belt Company and by the Southern Company, but it gave notice of its claim and requested its payment, and neither the committee nor the Southern Company ever declared before the Trust Company exchanged its stock and bonds that they would not settle or pay it if the Belt Company really owed it.

The legal presumption was, and the Trust Company had a right to rely thereon, that the scheme disclosed by the reorganization agreement would be executed in a just and lawful way and that its claim and the claims of all creditors of the Belt Company would be adjusted and settled by full or partial payment by the committee and neither its action as a depositor nor its activity to persuade others to accept the plan, nor its exchange of its stocks and bonds, constituted any representation that the plan would not be so executed, that the transfer of the property of the Belt Company to the Southern Company would be illegal and fraudulent as to creditors, nor any consent to or participation in such an execution of the agreement. That transfer had not then been made, the Southern Company held the stock of the Belt Company charged with the trust to secure for its creditors at least as much as it had paid to its stockholders, and there was no notice or presumption that it would violate its trust. The Trust Company made no misrepresentation by any of its acts or omissions of any known fact on which an estoppel in favor of the Southern Company can be based. Second, the reorganization agreement showed that under it the title in fee of the property of the Belt Company was to be transferred to the new company, the Southern Company, and brought under the lien of its mortgage by means of the exchange of the stock of the Belt Company for the stock of the Southern Company, and this disclosure and the law notified the Southern Company and every one who received any stocks or bonds of that company that the acquisition of that stock in that way and its pledge under the mortgage charged the Southern Company, its bondholders and its stockholders, with a trust to secure and distribute to the creditors of the Belt Company the value of their equity in the property of that company, and the answers of the Trust Company in the Provident Company's foreclosure suit, its application to file its cross-bill, and the paragraph in the decree of foreclosure which exempted the Trust Company from the effect of that decree, kept that notice flaming in the record, so that neither the Southern Company nor any of its bondholders or stockholders were without equal means of knowledge nor without notice under the law that the transfer of the property of the Belt Company to the Southern Company without offering to pay or paying anything to its creditors was a breach of trust, fraudulent and voidable as to them.

Moreover, although it is immaterial under the opinion in Northern Pacific Ry. Co. v. Boyd, 228 U. S. 502, 33 Sup. Ct. 554, 57 L. Ed. 931, whether they were notified of the Trust Company's claim or not, they all had notice of it by its presentation to one of the committee, by the Southern Company's possession of the books of the Belt Company as early as April 1, 1901, by the answers and the application to file the

cross-bill in the foreclosure suit, and by the terms of the decree therein. The committee, the Southern Company, its stockholders and bondholders, had at least equal means of knowledge and had notice under the law of the truth regarding all material things in this transaction to which the Trust Company's acts and omissions, and its exchange of stock and bonds relate. There were no innocent stockholders or bondholders of the Southern Company in or since this transaction. Third, neither the Southern Company nor its stockholders nor bondholders will suffer any injury by proof of the truth in this transaction and the granting to the Trust Company of the equitable relief to which it was entitled in 1901. They took to themselves by a breach of trust and a transfer fraudulent as to creditors by the foreclosure sale on December 31, 1901, an equity in the property of the Belt Company of a value in excess of the amount of the Trust Company's claim, then about $360,000, which belonged to that company, and they have held and enjoyed it ever since. Each stockholder and bondholder has had, and still has, the benefit of his just proportion of that equity. If now the Southern Company is required to restore that equity or its value in 1901, with interest from that date, each stockholder and bondholder will lose the benefit of its just proportion of that equity which it wrongfully holds and nothing more. Nor will the Trust Company secure or retain any unjust share or advantage. While it will receive the value of that equity to which it as a creditor of the Belt Company was entitled in 1901 with interest, its stocks and bonds issued by the Southern Company will lose the benefit of that equity in the same proportion as will the stocks and bonds of others. The stocks and bonds of the Trust Company and of all the other holders of stocks and bonds in the Southern Company will be diminished in value in the exact proportion by which they were enhanced in value by the wrongful appropriation of the equity of the Trust Company in the property of the Belt Company which the Southern Company wrongfully took and holds, and the justice and equity to all which should have been done many years ago will now as nearly as practicable be administered.

This question of estoppel was ably and exhaustively argued. It has not failed to receive the study and meditation of each member of this court. But for the reasons which have now been stated, perhaps at too great length, this study and meditation have but confirmed the court in its former view, and its conclusion still remains that the Trust Company was not estopped either by its promotion of the reorganization agreement, its signature to it, its exchange of stock, or its alleged laches, from prosecuting its claim against the Southern Company to adequate relief.

In the course of their argument counsel have invoked the maxims that he who seeks equity must do equity and that he who seeks equity must come into court with clean hands, and have claimed that the Trust Company is entitled to no relief because it participated in the formation and execution of a fraudulent scheme. The answer has been given. The fraud and breach of trust which made the transfer voidable as to creditors were not committed nor disclosed until after the Trust Company's acts in the formation and execution of the plan

had been done. The presumption of law was, when it exchanged its stock, that the fraud and breach of trust were not being perpetrated and it did not participate in their perpetration. Its hands are not soiled, and if its claim is paid by the Southern Company it, and all the parties in interest in this transaction, will have done and received equity.

5. Counsel have argued the question whether the Trust Company or the Southern Company has the superior equity in the lands of the Central Company, but the court is not convinced that it was in error in the conclusion upon this subject which it announced in its former opinion at pages 824, 826, 827 and 828 of 201 Fed., page 121 of 120 C. C. C. A., and as, unless the court is in error on the questions which have already been discussed, that question is no longer material because the Southern Company may have no relief in that regard, unless it pays the claim of the Trust Company, the court refrains from another discussion of it.

[12] 6. Objection is made to the entry of a decree at this time in favor of the Trust Company for the payment of its claim by the Southern Company on the grounds that the Trust Company filed no cross-bill and made no specific prayer for such relief in its answer, and because the Southern Company should have an opportunity to offer evidence and to be heard upon the question whether or not the Trust Company is entitled to such relief. But the issues whether or not the property of the Belt Company taken by the Southern Company, whether or not the property of the Central Company by reason of the pledge of its stock, and whether or not the Southern Company itself, was liable to pay the debt of the Belt Company to the Trust Company, were all necessarily presented and litigated under the pleading and litigation of the controlling issue whether or nor the Southern Company by its acquisition of the property of the Belt Company, its exchange of stock, and its foreclosure sale deprived the Trust Company of its equity in that property and exempted itself from liability. Opportunity was offered and embraced to present evidence to consider and argue these questions. The Southern Company received ample notice of the claim of the Trust Company that it and the property of the Belt Company which it acquired were liable to pay its claim against the Belt Company. In its petition for leave to file a cross-bill in the foreclosure suit in October, 1901, the Trust Company asserted its right to be paid out of the property of the Belt Company to be superior to that of the expected purchaser at the foreclosure sale of that property, and the liability of such purchaser to pay it and the right of the Trust Company to assert its claim against the property and the purchaser were expressly reserved by the decree. In its answer to the amended intervening petition of the Southern Company in this suit filed on May 20, 1905, it made a like averment which was denied by the replication of the Southern Company. A review of the facts disclosed by the master's report and of the pleadings and proceedings printed in the record before us has convinced that the indisputable facts and the law of this case are such that an opening of the case and the recep-

tion of further evidence would not change the result or benefit any party thereto.

The court has ample power to remand the case and permit the filing of a cross-bill or an amendment of the answer so as to pray for the specific relief to which the Trust Company is entitled. Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co., 142 U. S. 396, 413–416, 12 Sup. Ct. 188, 35 L. Ed. 1055; Hardin v. Boyd, 113 U. S. 756, 5 Sup. Ct. 771, 28 L. Ed. 1141; Clark v. Clark, 62 N. H. 267, 272; Trimble v. Wollman, 71 Mo. App. 467, 484. But that would be a useless proceeding, and neither the law nor the rules and practice in equity require the performance of futile acts. An answer may be treated as a cross-bill, and the rights and remedies which the defendant has alleged in its answer and at the hearing has proved it is entitled to enforce may be maintained and enforced although its prayer is limited to a dismissal of the bill. Bradford v. Union Bank of Tennessee, 13 How. 57, 68, 69, 14 L. Ed. 49; Walden v. Bodley, 14 Pet. 156, 164, 10 L. Ed. 398; Moran v. Hagerman, 64 Fed. 499, 503, 504, 12 C. C. A. 239; Wyatt v. Sweet, 48 Mich. 539, 12 N. W. 692, 693, 13 N. W. 525. In Walden v. Bodley, 14 Pet. at page 164, 10 L. Ed. 398, the Supreme Court said on this subject:

"It would be a reproach to the administration of justice, if in this case the parties should be left, by the decision of this court, apparently, as remote from a final determination of it, as they were 40 years ago. It ·is true, the answer prays merely for a dissolution of the injunction, and that the bill may be dismissed. But the court have, by the bill, answer, and evidence, the equities of the parties before them; and, having jurisdiction of the main points, they may settle the whole matter. A court of equity cannot act upon a case which is not fairly made by the bill and answer. But it is not necessary that these should point out in detail the means which the court should adopt in giving relief."

These rules and authorities and the principle of equity that a court of chancery which once acquires jurisdiction of the subject-matter and the parties to a controversy ought, if possible, to determine the entire matter and grant just relief to each party, the length of time this litigation has already been pursued, and the greater danger of injustice from its continuance than from its termination, have persuaded that the ends of justice will be best served by the entry of a decree in this case upon the issue of the mandate in favor of the Trust Company for the relief to which it is entitled.

7. Counsel for three of the stockholders of the Trust Company have been heard upon their petition that this court adjudge that certain of the litigation herein instituted by the Cambria Company, the Belt Company, and the Southern Company was commenced and prosecuted in bad faith, and that it direct the court below to find the amount of attorneys' fees, stenographers' fees, and expert accountants' fees necessarily incurred by the Trust Company in that litigation, and, after the entry of the main decree, to render a further decree in favor of the Trust Company and against the Southern Company for the aggregate of these amounts, or that this court direct the court below to insert in its decree an adjudication that it is rendered without prejudice to the right of the Trust Company to sue the Southern Compa-

ny for those sums, that this court also direct the court below to include in the costs herein the damages, costs, fees, and expenses incurred by the Trust Company in the injunction suit reported in Guardian Trust Co. v. Kansas City Southern Ry. Co., 171 Fed. 43, 96 C. C. A. 285, 28 L. R. A. (N. S.) 620, and also to insert in the decree an adjudication that the decree shall not prejudice the right of the Trust Company to move for such damages, costs, fees, and expenses in the injunction suit reported in Guardian Trust Co. v. Kansas City Southern Ry. Co., 146 Fed. 337, 76 C. C. A. 615. A deliberate consideration of this petition and of the exhaustive arguments of counsel have, however, persuaded that inasmuch as the questions suggested came for the first time into this suit at the rehearing in this court, as no evidence has been taken relative to them, and as the evidence upon the issues tried in this case was not brought to this court, it would be unwise and might be unjust to adjudicate the questions presented by the petition of these stockholders. Moreover, as this court cannot rightly determine the questions relating to the costs to be taxed at this time, as there are established rules of practice concerning them, and as directions to the court below to open and try new issues might, and probably would, prolong this litigation through several years more, our conclusion is that our just course is to leave the taxation of costs to the court below under the principles, rules, and practice in equity.

And the conclusion of the whole matter is that the decree below should be reversed and the district court should render a decree which should contain the first five paragraphs of the former decree, except that the proceeds of the sale of 99 first mortgage bonds and coupons of the Kansas City & Northern Connecting Railroad Company, amounting to $40,001.25, referred to in paragraph 5 of the former decree, together with all interest which has accrued and shall accrue, has been and shall actually be earned on said sum, shall be applied as a credit at the time when the Trust Company shall receive said sum as its own, upon the amount which the Southern Company should pay to the Trust Company, as hereinafter provided, which future decree should also adjudge that the Southern Company is indebted to and should pay to the Trust Company the amount of the indebtedness of the Belt Company to the Trust Company, that is to say, the sum of $639,658.86 and interest from the date of the former decree on $473,723.59 at 6 per cent. per annum, on $46,565.76 at 7 per cent. per annum, and on $119,369.51 at 8 per cent. per annum, and the costs of this suit; that the Trust Company's right to and equity in the property of the Belt Company which was transferred to the Southern Company by means of the exchange of the stock of the Belt Company for the stock of the Southern Company and by the foreclosure proceedings, sale, and conveyance, and otherwise, was and is prior in time and superior in equity and right, to the extent necessary to pay that debt, to the right, title, and equity of the Southern Company therein; that by virtue of the indebtedness of the Belt Company to the Trust Company and the pledge to it of 1,120 shares of the stock of the Central Company, the equity and right of the Trust Company in the property of the Central Company described in the sixth paragraph of the former decree is superior, to the extent necessary to pay

that debt, to the right, title, claim, and equity of the Southern Company therein; that in case the Southern Company shall pay its debt to the Trust Company and the costs of this suit adjudged in this suit by a day to be named in the decree, then all the collateral security described in paragraph 5 of the former decree which has not then been disposed of, and all the proceeds of such security which has not then been disposed of or applied, shall be surrendered and delivered to the Southern Company; that in case the Southern Company fails to pay its debt to the Trust Company and the costs of this suit by a day to be named by the court in the decree, then the said property of the Central Company and the property of the Belt Company which was transferred to the Southern Company as aforesaid, and the collateral security then remaining in the possession of the Trust Company, or such part or all said property as it shall be necessary to sell in order to pay the debt and costs out of the proceeds of the sale or sales, to which the Trust Company, in view of the pledge to it of only 1,120 shares of the stock of the Central Company and the possible equities of the Central Company's other stockholders and creditors, shall be equitably entitled, be sold by a master or receiver to be named by the court; that the proceeds of such sale or sales to which the Trust Company shall be equitably entitled be applied to the payment of the debt and of the costs after as well as before the decree until they are completely paid; and that the remainder of the proceeds, if any, be paid to the Southern Company or to such other party as may be equitably entitled thereto; that on the demand of the master the Southern Company, the Trust Company, the Central Company and its receiver, surrender and deliver to him, or to the purchaser or purchasers of any of this property as the master shall direct, such part or all of said property as he shall specify; and that, if an amount to which the Trust Company shall be equitably entitled sufficient to pay the debt with interest and the costs before and after the decree is not realized from the sales, then that the Trust Company have judgment and execution against the Southern Company for the remainder unpaid. The decree should adjudge that the Trust Company may recover its costs down to the entry of the decree of the Cambria Company as well as of the Southern Company, and the court may apportion those costs between them, but not as against the Trust Company, which should be permitted to pursue either or both of them until its costs are paid. The District Court should reserve in the decree full jurisdiction to render such further decrees and take such subsequent proceedings in the suit as equity and good conscience may require.

Let the decree be reversed, and let the cases be remanded to the District Court, with directions to render a decree for the Trust Company in accord with the views expressed in this opinion.